# Richmond.

BALDWIN v. BALDWIN'S EXECUTOR, &C.

FEBRUARY 4th, 1886.

1. WILLS—*Execution—Presence—Case at bar.*—Entering room of testatrix, her friend, S., said to her : " These gentlemen, F. and R., have come to witness the will." She bowed her head in assent. The will was read to her by F. in an audible voice ; and on being asked if she understood it, she signified her assent as before. She then signed the will in a legible manner, her arm being held to steady it, but the pen not being touched. She was then laid back in a recumbent posture as before, and the witnesses, F. and R., subscribed the will at a table in the little room near the foot of the bed in her presence, both being present together. She was so lying that she was obliged to see them, unless she shut her eyes or turned her head away.

HELD :

Such will was duly executed as required by statute.

2. IDEM—*Presence of testator.*—What is such presence? In company with—in the same room with—within the view of the testator, coupled with consciousness on his part of such proximity. *Neil* v. *Neil,* 1 Leigh, 11 ; *Nock* v. *Nock,* 10 Gratt. 119 ; *Cheatham* v. *Hatcher,* 30 Gratt. 56.

Appeal from decree of chancery court of city of Richmond, in the suit of David J. Baldwin, complainant, against Franklin Stearns, executor of the last will and testament of Mary Fannie Baldwin, deceased, and Virginia V. Baldwin, defendants, entered February 27, 1885, on the issue of *devisavit vel non.* The jury being waived, all matters of law and of fact

were submitted to the court, by which the issues were decided in favor of the defendants, the propounders of the will. From this decree the complainant appealed to this court.

Opinion states the case.

*B. T. Crump*, for the appellant.

*Cannon & Courtney* and *J. G. Blackwell*, for the appellees.

LACY, J., delivered the opinion of the court.

In September, 1884, David J. Baldwin filed his bill in the said court to impeach the will of his deceased sister, Mary F. Baldwin, which had been admitted to probate in the said court April 3, 1883, upon the ground that it was not executed in the mode required by law; that the testatrix was not of sound mind when the will was executed, owing to the effect of disease; and that her mind being weakened and her body enfeebled by her sickness, she had been the victim of undue influence, selfishly exercised over her by her sister-in-law and the executor named in the will, who were, together with their friends, the only companions of her last days; that the testatrix had committed the injustice of overlooking altogether her own relations, and had bestowed her whole estate—real and personal—upon her brother's widow.

The chief beneficiary was Virginia V. Baldwin, the widow of C. J. Baldwin, deceased, who answered the bill, as did also Franklin Stearns, the executor. They denied any undue influence of any sort, and all injustice alleged in the bill, as to the provisions of the will, and alleged that C. J. Baldwin, deceased, the late husband of the respondent, Virginia V. Baldwin, was the oldest brother of the testatrix; that upon the death of their parents the said C. J. Bald_

win had taken his sister to live with him and his wife, Virginia M. Baldwin, and provided for all her wants until his death, and at his death had devised his home, situated in Richmond city, and which had been so long their home together, to his wife and this sister in equal interest, and had bequeathed to them—share and share alike—the money belonging to him in the hands of Franklin Stearns, the said Stearns being appointed his executor, to act as such without giving security; that this property thus left her by her deceased brother was by the said sister given by her will to this brother's widow, who survived her; that the interest testatrix had in the estate of another deceased brother, together with whatever else she might have, other than such as she derived from the late husband of Virginia V. Baldwin, she had given to her surviving brothers, confining her benefactions as to Virginia V. Baldwin to the property derived from her husband, and giving her own relatives everything else she possessed; that to the making of such a just and altogether natural will no undue influence was necessary, and none was used; that no suggestion was ever made to the testatrix as to how her property should be disposed of; and that her will had been prepared for her only at her own request, often repeated, and in accordance with clearly expressed wishes.

An issue was made up in the said court as to the validity of the said will, and a jury impaneled to try the same. The evidence being heard, both sides waived a jury, and by consent the jury was discharged from further consideration of the cause, and the whole case submitted to the judge, who rendered a decree sustaining the validity of the will.

The defendant moved for a new trial, and the said motion being overruled, upon the motion of the said defendant the evidence in the cause was certified; which consists exclusively of the evidence of the plaintiff, none being offered by the

defendant. Thereupon the defendant applied to this court for an appeal; which was allowed.

There being no evidence in the cause whatever which tends to sustain the charge of undue influence, there being no hint to be found anywhere throughout the evidence to give any countenance whatever to such a charge, it is unnecessary to say more on that point than that it is not sustained.

As to the sanity and capacity of the testatrix when the will was executed, there can be no serious question. The evidence shows that the testatrix was sick and weak, but when the will was to be witnessed, the executor named therein and two witnesses of the highest character and of superior intelligence, gathered together around the bedside of the sick woman, with her nurse, and when the will was read to her, she was asked if she understood and approved it, and she bowed her head, giving such assent as satisfied these gentlemen. Writing her name in a recumbent posture, in a somewhat illegible manner, she was told by the witnesses that she had better sign again, and she was raised up in bed, and a pen given her, when she again subscribed her name in a perfectly legible manner, the will being laid before her on a book. All the witnesses to the ceremony concur in the assertion that she was perfectly conscious of all that she was doing, and that no contrary suspicion entered their minds either then, nor has it since. It cannot be doubted that she was possessed at the time of a conscious and capable mind.

As to the execution of the will, the evidence is, that upon entering her room on the day of the execution of her will, Mr. Stearns said to the testatrix that these gentlemen had come to witness the will, and she bowed her head in assent. The will was then read to her by one of the witnesses, Rev. Francis M. Burch, in a clear and audible voice, and upon being asked if she understood it, she signified her assent as before. She then

signed the will in a legible manner, her arm being held to steady it, but the pen not touched. The testatrix was then laid back in a recumbent posture as before, and the witnesses subscribed the will at a table in the little room near the foot of the bed, in the presence of the testatrix, both being present together. That she saw them, cannot be doubted; she was lying with her head inclined toward the witnesses, and the foot-board to the bed was very low. And the evidence is that the testatrix could not have done otherwise than see the witnesses when they subscribed the will; the room was only twelve feet square. The witnesses say that they were not looking at the testatrix when in the act of subscribing the will as witnesses, but that, unless she shut her eyes, or turned her head away, she was obliged to see them.

There is no evidence that the testatrix requested the witnesses to subscribe the will as such, but Mr. Stearns said when he came in the room, that these gentlemen had come to witness the will, and the testatrix bowed her head in assent. She did not speak, but it is proved that she could speak, and did speak that day in a low, but audible voice—low on account of weakness—to the executor, Mr. Franklin Stearns, on the morning of the day, about ten o'clock, and Mr. Stearns says that her mind was *bright and clear.* If, then, she understood Mr. Stearns to say that these gentlemen had come to witness the will, and assented, and then saw them subscribe the will as witnesses, was any other request necessary?

Rev. Mr. Burch says that Mr. R. L. Brown, a subscribing witness, asked the testatrix, after the will was read by Mr. Burch, whether she understood that she was giving all her property to Mrs. Jennie Baldwin, and she bowed in assent. Mr. Brown does not remember asking this question, but thinks he did not say that, but has an indistinct impression that he said something to her, perhaps, "Miss Fanny, do you know

this is your will?" Mr. Brown says that Miss Fanny could not have seen the will when it was subscribed by the witness, but she could see the table on which it was lying, and the persons of the subscribing witnesses who were between her and the will; and that he thought the testatrix understood perfectly well that she was making her will and disposing of her property, and he had known her all his life.

What is "in presence of the testator" has been often the subject of judicial investigation and construction. Actual presence is being bodily in the precise spot indicated. Constructive presence is being so near to, or in such relation with the parties actually in a designated place as to be considered in law as being in the place. He who is incapable of giving his consent to an act is not to be considered present, although he be actually in the place. It would seem that a lunatic, or a person sleeping when the act was done, could not be considered present.

Under the English statute of frauds, it has been said that an actual presence is not indispensable, but that when there was a constructive presence it was sufficient; as when the testatrix executed the will in her carriage standing before the office of her solicitor—the witness retired into the office to attest it—and it being proved that the carriage was accidently put back, so that she was in a position to see the witness sign the will through the window of the office. *Casson* v. *Dade.* 1 Brown C. C., p. 98.

Judge Carr said, in *Neil* v. *Neil*, 1 Leigh, 11: "Signing in the presence of the testator was to enable him to see that *the persons* he confided in were those who attested, and to prevent a false paper being imposed upon *them*. The phrase employed is one in common use—in presence of the testator. What is presence? The opposite of absence. It may be said of every attestation that it was either in the presence, or in the

absence, of the testator.    Presence seems to mean, in company with—within the view of—in the same room with.    Thus, if you ask a man, were you present when such a thing happened? He will answer. 'Yes, I was in the same room.'    If a man be in one room, and the transaction take place in another room of the house, it would certainly, *prima facie*, be considered out of his presence.    In all the cases, therefore, when an attestation out of the room of the testator has been supported, the court has extended the construction to take in the cases within the meaning, though not the strict words of the statute.    This the courts are always inclined to do; and on no subject have they gone farther than in support of the last wills of the dead when the objection is technical, and the meaning of the statute has been substantially complied with.    Thus, in *Right* v. *Price*, 1 Doug. 243, Lord Mansfield says: 'The court would lean in support of a fair will, and not defeat it for a slip in form when the meaning had been complied with.'"    Judge Green, in the same case (*Neil* v. *Neil*), said: "Courts of justice have always, and very properly, leaned strongly in favor of the validity of wills fairly made, and when there is no imputation of fraud.    *    *    *    Where the testator and the witnesses are together for the purpose of attesting a will, and so their attention specially called to that object; if they be in such a situation that the testator may, if he pleases, by the exertion of his own volition and physical powers, without materially changing his position with reference to place, and without the assistance of others, see the witnesses subscribe, that is a subscribing in his presence.    And perhaps the cases justify us in saying that this is, under such circumstances, a presumption or conclusion of law against which no evidence will be received."    Judge Coalter said, in that case, speaking of the witnesses: "And, therefore, the most that they can be required to prove is that he (the testator) was so present to them, and they to him, as that he might, and, therefore, pro-

bably did, see the attestation." Judge Cabell said on this subject: "An attestation, therefore, out of the room of the testator, but proved to be within the scope of his vision, becomes good as being in his presence; and an attestation in the same room, but proved to be out of the scope of his vision, becomes bad as not being in his presence. And this is, as I take it, the substance of all the authorities." Judge Brooke said: "It is admitted that it need not be proved that the testator *actually saw* the attestation of the will, if he had the power to see it; and that he may dispense with this portion of his controlling influence, and turn his back upon the witnesses when they attest the will. * * * The statute might have required that the testator should actually see the witnesses subscribe the will, but this would have rendered it impossible for a blind man to make a will." This case was considered and decided by a full bench, and all the judges wrote opinions; and while they differed in the result of the case—a majority being of opinion to reverse the case, and reject the will—they all concurred in the foregoing views, as we have seen. In that case the testator, being incapable of moving himself, was placed after he had signed the will with his face to the wall and his back to the witnesses when they subscribed the will, so that, although in the same room with the witnesses, he did not, and could not by the exercise of any power which he possessed, have seen the witnesses subscribe the will; although in the same room with him, they were not within the scope of his vision, and he had no power to bring them within it. In that case a majority of the judges held that they were not in his presence.

This case has met with some disapproval from some of the judges of this court in subsequent decisions, but has been followed, and is relied on by the counsel for the appellant here as conclusive of this case. But each case is, as to this question,

dependent upon its own circumstances. In this case the witnesses were not only in the same room, but within the line of vision of a conscious, and capable, and consenting testatrix, who could, and who, as far as this evidence goes, did see the attesting witnesses subscribing the will which she had herself just heard read in a clear and distinct voice, and had then signed legibly with her own hand.

Judge Moncure, speaking for this court in the case of *Nock* v. *Nock*, 10 Gratt. 119, says of the case of *Neil* v. *Neil, supra:* " Its effect has been to modify in this State the general rule, and add thereto this proviso: that if the testator be physically unable to change his position, the witnesses must make their subscriptions within the range of his vision." And then remarks: "The word room does not occur in the statute; nor does the word sight. Presence is the only word there used, and when it exists, sight is unnecessary, and the statute is satisfied. A blind man can make a will, which, of course, he could not do if sight were necessary. * * * Proximity and consciousness may create presence. Will they (the witnesses) be considered as not in his (the testator's) presence merely because, in the actual position which he happens to be, he cannot see their forearms and writing hands, and the paper itself? The statute says nothing about forearms, or writing hands, or seeing the will itself. It requires the witnesses to subscribe their names in the testator's presence. He cannot, in the nature of things, see their whole persons at the same time. They are in his presence, whether their faces or their backs are towards him. And if, being in his presence, they subscribe their names, the statute is literally complied with. There is not even a slip of form, and the attestation is good. If he does not choose to see when he can so easily see, the forearms and writing hands, and paper itself, and when he sees and hears

that the attestation is going on, it is the same thing as if he had actually seen them." Citing the case of *Shires* v. *Glascock*, 2 Salk. R. 688; *Davy* v. *Smith*, 3 Salk. R. 395; and also *Casson* v. *Dade*, 1 Bro. C. C., *supra*.

The case of *Graham* v. *Graham*, 10 Iredell, 219, relied on as authority here, cannot be so considered. In that case the witnesses were out of the presence of the testator, out of the room, and the testator could not see them where he laid in his bed. But the contention was, that by looking around the door-post he might have seen them. Judge Ruffin held that the subscribing by the witnesses was not in the presence of the testator, and it was quite clear, I think, that the testator knew nothing of his own knowledge of the subscribing by the witnesses, and he could not have so known of it in the situation in which he was left.

This is equally true of the cited case of *Robinson* v. *King*, 6 Ga. 539.

The case of *Aikin* v *Weckerly*, 19 Mich. 482, is also relied on by the appellant, but an examination of that case shows that it was unanimously held that, "the condition and position of the testator, when his will is attested, and in reference to the act of signing by the witnesses, and their locality when signing, must be such that he has knowledge of what is going forward, and is mentally observant of the specific act in progress; and unless he is blind, the signing by the witnesses must occur when the testator, as he is circumstanced, may see them sign, if he chooses to do so."

See also the case of *Cheatham* v. *Hatcher*, 30 Gratt. 56—opinion of Judge Staples, and the authorities he cites.

Upon a review of the evidence in this case, and of the foregoing authorities, it is clear, we think, that the will in question in this case was duly executed in accordance with the statutes

of this State.    And upon  the whole case, and  a  consideration of all the questions discussed by the learned counsel here, we are of opinion that there is no error  in  the decree of  the chancery court  of  Richmond  city,  sustaining  the validity of  the  said will, and the same must be affirmed.

DECREE AFFIRMED.