# Richmond.

## TUCKER v. SANDIDGE, CURATOR.

### December 13th, 1888.

1. WILLS—*Testamentary capacity.*—Testator, in making his will, must be capable of understanding the nature of the business he is engaged in, and the elements his will is composed of, and the disposition of his property thereby provided for, both as to the property and the persons he means to give it to, and how it is to be disposed of among them.

2. IDEM—*Onus probandi.*—Burden of proving capacity is on propounder of the will. Nothing short of clear and convincing evidence will suffice. *Riddell* v. *Johnson*, 26 Gratt. 152.

3. IDEM—*Execution—Attesting witnesses—Rule—Exception.*—General rule is, that one signing his name as witness to a will, by this act solemnly testifies to testator's sanity. If afterwards he attempts to impeach the will's validity, his testimony is not to be positively rejected, but received with the most scrupulous jealousy. *Young* v. *Barner*, 27 Gratt. 103. But this rule ought not to be rigorously applied where such witnesses, suddenly called upon by the propounder to attest the will without time for due deliberation, testify in his behalf and are bound to detail the circumstances, affording the only reliable data from which the court can deduce its conclusions.

4. IDEM—*Presence.*—The presence of the testator wherein the statute requires attesting witnesses to subscribe their names as such to a will, means the testator's "conscious presence." *Baldwin* v. *Baldwin*, 81 Va. 405.

5. APPELLATE COURT—*Two verdicts—Rule under Code* 1887, § 3484.— Where, at trial, under Code 1873, ch. 118, § 32, jury finds against the will, verdict is set aside on motion of plaintiff. At second trial jury finds for the will. Motion for defendants to set aside verdict is overruled, and the defendants having excepted, and the evidence (not the facts) certified, on appeal;

HELD:

> Under Code 1887, § 3484, plaintiff in error's exception must, in considering the decision of the court below setting aside the first

verdict, be treated as a demurrer to the evidence, and all his oral evidence treated as waived, and all his adversary's evidence and all fair influences therefrom be treated as true, instead of considering the whole evidence at the first trial as under the rule before § 3484 was enacted.

6. IDEM.—For discussion of rule established by said § 3484, see opinion.

7. WILLS—*Two verdicts—Case at bar.*—In the case here, upon the evidence certified, considered under the rule pertaining to a demurrer to the evidence;

HELD:

The court below erred in setting aside the first verdict, and judgment should be entered on that verdict, and all subsequent proceedings annulled.

Error to judgment of circuit court of Amherst county, rendered August 18th, 1887, upon a verdict of a jury impanelled to try the issue of *devisavit vel non,* under Code 1873, chapter 118, section 32, wherein John S. Sandidge, as executor of William Tucker, deceased, was plaintiff, and Callie Tucker, L. Miller and Emma, his wife, Erastus Watts and Nannie, his wife, and Charles, James and Lucy Tucker were the defendants and contestants. The jury found a verdict that the paper writing propounded by the plaintiff as the decedent's will was not his will. The court, on motion of propounder, set aside the verdict and awarded a new trial. At the second trial the jury found by their verdict that the said paper writing was the decedent's will. The contestants moved the court to set aside this verdict and grant them a new trial. This motion the court overruled. The contestants excepted to this ruling, and the court certified the evidence and entered judgment in accordance with the verdict. To this judgment the contestants obtained a writ of error and *supersedeas.* The opinion states the case.

*W. G. Loving, J. Thompson Brown,* and *J. T. Coleman,* for the plaintiff in error.

*Coghill & Berry,* for the defendants in error.

RICHARDSON, J., delivered the opinion of the court.

This is a controversy respecting a paper writing, dated August 18th, 1884, purporting to be the last will of Wm. Tucker, deceased, late of Amherst county, propounded as such by John S. Sandidge, who is named therein as executor.

The facts necessary to correctly outline the case are these: Wm. Tucker, the decedent, departed this life on the 23d of August, 1884, seized and possessed of a considerable estate, real and personal, supposed to be worth some $10,000. He had been twice married; and has left surviving him his second wife, Ann, and numerous children, the issue of the two marriages. By his first marriage he left the following children, to wit: Millie Ann Tucker, Susie Tucker, Bettie, wife of Johnnie Tucker and Sophia, wife of John Story. The children left by the second marriage were Callie Tucker, Emma, wife of L. Miller, Nannie (a granddaughter), wife of Erastus Watts, Charles Tucker, James Tucker and Lucy Tucker, the last two being infants.

On the 13th day of September, 1884, John S. Sandidge, the person named as executor in the alleged will, in the county court of Amherst, offered said paper for probate, which is as follows:

"I, William Tucker, of lawful age and sound mind, do make this my last will and *testiment*, revoking all others, in words and figures following, to-wit: *First*, I desire all of my just debts to be paid, if any. Second, I give to my beloved wife, Ann Tucker, two hundred dollars, to be paid out of my estate. Third, I give to my four daughters, by my first wife, Millie Ann Tucker, Susie Tucker, Bettie Tucker, wife *to* Johnnie Tucker, Sophia Tucker, wife *to* John Story, all my estate, real and personal; after taking out what I give to my daughter, Millie Ann Tucker, extry; *Fourth* I give to my daughter, Millie Ann Tucker, all my bonds, money and *bees*; fifth, I desire that my daughter, Sophia Tucker's interest, wife to John Story, be left in trust, and I appoint John S. Sandidge trustee for said daughter;

sixth, it is my desire that my son-in-law, Johnnie Tucker, manage for my two daughters, Millie Ann and Susie Tucker, and see that they are cared for; seventh, I constitute and appoint John S. Sandidge executor, to carry out this my last will and *testiment.*

Given under my hand this the 18th day of August, 1884.

Witness :                                          WM. TUCKER."
    S. A. LOVE,
    C. T. SMITH.

Whereupon Callie, L. Miller and Emma, his wife, Erastus Watts and Nannie, his wife, Charles Tucker, James Tucker and Lucy Tucker, who are the appellants here, were, on their motion, entered as contestants of said paper so offered for probate ; and the court, on his motion, appointed said propounder, John S. Sandidge, curator of said decedent's estate; and he entered into the required bond, with surety, and the cause was continued.

At the November term, 1884, of said county court, the cause was heard, when the court, on consideration of all the evidence offered on both sides, and the arguments of counsel, decided that said Wm. Tucker, deceased, at the time of executing the writing aforesaid, purporting to be his last will, was of sound and disposing mind and memory, and that the said writing being proved by the oaths of S. A. Love and C. T. Smith, the subscribing witnesses thereto, ordered the same to be recorded as the true last will and testament of the said William Tucker ; whereupon the contestants, Callie Tucker and others, obtained an appeal from said decision to the circuit court of said county of Amherst.

At the April term, 1886, of said circuit court, the cause came on to hearing, when, it being suggested that two of the appellants, James and Lucy Tucker, children of said Wm. Tucker, were infants, on motion, the court appointed Mary Ann Tucker

their *guardian ad litem*; and thereupon, on the motion of said infant appellants, by their *guardian ad litem*, and the other appellants, by their counsel, the court caused a jury to be empannelled to try the issue, *devisavit vel non*, directed by the court in the cause.

The jury at the trial having heard all the evidence on both sides, and the arguments of counsel, returned the following verdict:

" We, the jury, find that the paper writing, dated the 18th day of August, 1884, and offered for probate as the will of Wm. Tucker, deceased, is not the true last will and testament of Wm. Tucker, deceased. " And thereupon John S. Sandidge, the propounder of said paper, moved the court to set aside the verdict and grant a new trial, upon the ground that the same was contrary to the law and the evidence; which motion the court granted, and made an order setting aside the verdict and awarding a new trial; to which judgment, the appellants, said con-testants, excepted, and in their bill of exceptions the court certified, not the facts proved, but all the evidence.

Upon the record thus made in the circuit court, on the application of said contestants, an appeal was allowed, by one of the judges of this court, from said judgment of the circuit court. But, on the hearing here, the appeal was dismissed as having been improvidently allowed, there having been, in said circuit court, no end of litigation and no final judgment from which an appeal would lie. See *Tucker* v. *Sandidge, Curator*, 82 Va. 532.

When the cause went back to the circuit court, another jury was empannelled and a new trial of the issue had, on the 18th of August, 1887, at a special term of said court, and the jury, by their verdict, found that the paper writing aforesaid was the true last will and testament of said Wm. Tucker, deceased; whereupon the said contestants moved the court to set aside this verdict, because contrary to the law and the evidence, but the court overruled the motion and gave judgment according to the finding of the jury, and the contestants excepted; but

the court in this bill of exceptions did not certify either the facts or the evidence, there being no claim that the evidence on this trial was different from that on the former trial. And to the judgment and ruling aforesaid a writ of error and *supersedeas* was awarded by one of the judges of this court.

The question for decision is, was the alleged testator possessed of testamentary capacity at the time of the execution of the paper propounded as his will?

Before proceeding to examine the facts, it is appropriate first to advert to certain long settled and well recognized principles of law touching testamentary capacity.

The statute law of this Commonwealth provides that "no person of unsound mind or under the age of twenty-one years shall be capable of making a will, except that minors eighteen years of age or upwards may, by will, dispose of personal estate; nor shall a married woman be capable of making a will, except for the disposition of her separate estate, or in the exercise of a power of appointment." Code 1873, ch. 118, § 3. And as to the mode of executing wills, it is provided by the fourth section of same chapter that "no will shall be valid unless it be in writing and signed by the testator, or by some other person in his presence or by his direction, in such manner as to make it manifest that the name is intended as a signature; and, moreover, unless it be wholly written by the testator, the signature shall be made or the will acknowledged by him in the presence of at least two competent witnesses present at the same time; and such witnesses shall subscribe the will in the presence of the testator, but no form of attestation shall be necessary."

Such being the statutory requirements, we may with profit here reproduce the following extracts from authorities collected in the able and lucid opinion of Davies, J., in the leading case of *Delafield* v. *Parish*, 25 N. Y. R. 9, 22 (Redfield's Am. Cas. upon the Law of Wills, 158), where, after stating the universally accepted doctrine, that competency to execute a testament does not exist unless the alleged testator has reason and understand-

ing sufficient to comprehend such an act, proceeds to state from the authorities the law as follows :

"In the Marquis of Winchester case it is said that 'by law it is not sufficient that the testator be of memory, when he makes his will, to answer familiar and usual questions ; but he ought to have a disposing memory, so that he is able to make a disposition of his lands with understanding and reason, and that is such a memory which the law calls sound and perfect memory.'

"In *Mountain* v. *Bennett,* 1 Cox, 353, the Lord Chief Baron said : 'Two things must be made out, in the first instance, by those who support the will—the formality of the instrument and the sanity of the person making it; that if a party impeaching a will relies upon actual force being used upon the testator, it is incumbent on him to show it'; and he adds that 'there is another ground which, though not so distinct as actual force nor so easy to be proved, yet if it should be made out would certainly destroy the will; that is, if a dominion was acquired by any person over a mind of sufficient sanity to general purposes, and of sufficient soundness and discretion to regulate his affairs in general; yet, if such dominion or influence were acquired over him as to prevent the exercise of such discretion, it would be equally inconsistent with the idea of a disposing mind.'

"In *Marsh* v. *Tyrrell,* 2 Hogg. 122, that experienced and learned judge, Sir John Nicholl, said: 'It is a great but not uncommon error to suppose that, because a person can understand a question put to him, and can give a rational answer to such question, he is of perfect sound mind, and is capable of making a will for any purpose whatever; whereas, the rule of law, and it is the rule of common sense, *is far otherwise;* the competency of the mind must be judged of by the nature of the act to be done, from a consideration of all the circumstances of the case.'

"The observations of Erskine, J., in *Harwood* v. *Baker,* 3 Moore Priv. C. C. 282–290,   *   *   *   are worthy of note. He

says: 'But their lordships are of opinion that, in order to con-
stitute a sound disposing mind, a testator must not only be able
to understand that he is, by his will, giving the whole of his
property to one object of his regard, but that he must also have
capacity to comprehend the extent of his property, and the
nature of the claims of others, whom, by his will, he is exclud-
ing from all participation in that property'; and he justly and
truthfully adds 'that the protection of the law is in no case
more needed than it is in those where the mind has become too
much enfeebled to comprehend more objects than one, and most
especially when that object may be so forced upon the attention
of the invalid as to shut out all others that might require con-
sideration; and therefore the question which their lordships
propose to decide in this case is not whether Mr. Baker knew
when he was giving all his property to his wife and excluding
all his other relations from any share in it, but whether he was
at that time capable of recollecting who those relations were,
of understanding their respective claims upon his regard and
bounty, and of deliberately forming an intelligent purpose of
excluding them from any share of his property.'

"In *Den* v. *Jackson*, 2d Southard's R. 454, the chief justice,
in charging the jury on this point, said 'that a disposing mind
and memory is a mind and memory which has the capacity of
recollecting, discerning, and feeling the relations, connections,
and obligations of family and blood; that, though it has been
sometimes said, as had been stated from the books, that if one
could tell his name, say the day of the week, or even ask for
food, it is a sufficient evidence of a disposing mind; yet such
sayings, though they show that wills are not lightly to be set
aside on suggestions of incapacity, can and ought to have but
little weight with rational men, investigating the truth upon
their oaths; that if, upon the whole, they should be of opinion
that the mental powers of the testatrix were so far enfeebled and
broken as that she could not make a discreet disposition of her
affairs herself, and the will in question was devised by other

persons, and only assented to by her, upon being asked, without the power of understanding it, then they ought to find for the plaintiff; that is, that it was not her will.' * * *

"In *Shropshire* v. *Reno*, 5th J. J. Marsh, 91, Robertson, C. J., observed that the facts in that case led the court to the opinion 'that the testator had not a disposing mind, or that if he ever had, it was not in a disposing state. He was not superannuated, nor was he absolutely *stultus* or *fatuus*; but all the facts combined tend to show that he had not a *sound memory*, nor sufficient mind, nor a mind in a proper state for disposing of his estate with reason, or according to any fixed judgment or settled purpose of his own. This we consider the true test, established not only by philosophy, but by law.' *Converse* v. *Converse*, 21st Verm. R. 168, lays down the rule, that if ' the testator, when he made the will, was capable of knowing and understanding the nature of the business he was then engaged in, and the elements of which the will was composed, and the disposition of his property as therein provided for, both as to the property he meant to dispose of by his will and the persons to whom he meant to convey it, and the manner in which it was to be distributed between them, then he possessed a sound and disposing mind and memory.' This rule was approved by Redfield, J., who added : ' He must undoubtedly retain sufficient *active memory* to collect in his mind, without prompting, particulars or elements of the business to be transacted, and to hold them in his mind a sufficient length of time to perceive at least their obvious relations to each other, and be able to form some rational judgment in relation to them.'

"In 1828, Chancellor Walworth, in *Clarke* v. *Fisher*, 1 Paige, 171, said : ' The general principles in relation to the capacity of a person to make a will are well understood. He must be of sound and discerning mind and memory, so as to be capable of making a testamentary disposition of his property with sense and judgment in reference to the situation and amount of such property, and to the relative claims of different persons who are or

might be the objects of his bounty.' In that case the chancellor reversed the decision of the surrogate, which admitted the will of John Fisher to probate. The testamentary capacity of John Fisher was again the subject of judicial investigation before Vice Chancellor Sandford, in 1845 and 1846 (3d Sand. Ch. R. 351), and he held that he had testamentary capacity. But, on appeal, that decision was reversed by the chancellor, who held the will void, and the chancellor's decree was, on appeal, affirmed by the New York court of appeals. (2 Cor. R. 498.)"

The authorities above referred to, and an indefinite number of others that might be cited, state with clearness and accuracy the almost universally acknowledged principles applicable to the subject of testamentary capacity. They do not attempt, on the one hand, the difficult, if not impossible, task of laying down any precise rule as to the exact amount of mental capacity essential to a valid will; and, on the other hand, they carefully avoid that other and perhaps more dangerous doctrine, which has sometimes been held, that any degree of mental capacity above that of the idiot and the lunatic is sufficient; but, appealing to unfettered human reason as the only safe guide to rational and just testatorial conclusions and actions, they do prescribe the only sensible, judicious and safe rule for the guidance of the courts. They announce the simple, common sense doctrine that, in order to execute a valid will, the alleged testator must be shown to have possessed, at the time of making it, sufficient active memory to recall his family and his property, and to form some rational judgment in regard to the claims of the one and the disposition of the other, with reference to the claims of family and blood. In other words, as was said by Redfield, J., it must appear that the testator, when he made his will, "was capable of knowing and understanding the nature of the business he was then engaged in, and the elements of which the will was composed, and the disposition of his property, as therein provided for, both as to the property he meant to dispose of by his will, and the persons to whom he meant to convey it, and the manner in which it was to be distributed among them."

In this connection it only remains to consider upon whom the law casts the burden of upholding by proof the paper propounded as the will of a deceased person. The *onus probandi* is upon the party who seeks to set up the instrument in question, and this from the fact that the propounder alleges that the paper offered for probate is the true will of a free and capable testator, and hence it devolves upon him to make good his allegation ; that is, to prove by competent testimony that the instrument is what it purports to be ; for in every such case the conscience of the court is to be satisfied, and nothing short of clear and convincing evidence will suffice. This doctrine has been uniformly recognized and acted on by this court. See *Riddell* v. *Johnson's Ex'ors*, 26 Gratt. 152, and authorities cited.

In the light of the principles above stated, let us examine the facts of the case. The controversy is as to the probate of a paper alleged to be the last will of William Tucker.

If we look alone to the dispositions on the face of the alleged will we can but pronounce it both unjust and unnatural, as well as irrational. It is, on its face, unjust and unnatural because it disposes of the alleged testator's entire estate to his four daughters by his first marriage (except $200 to his wife), and excludes from all participation his numerous children by his second marriage, two of whom were infants, and one of the infants a daughter, for which no reason is assigned on the face of the paper. It is irrational in that it speaks of the alleged testator's wife as "my beloved wife," and yet attempts the absurdly impossible thing of putting her aside with the pittance of $200.

The paper was written by John S. Sandidge, the proponent, who is named therein as executor and as trustee for one of the daughter-devisees, and of whom no security is required. The question to be decided is, as to the testamentary capacity of the decedent, which also involves the question of the formal execution of the instrument.

The probate of the paper in question has been resisted from the start ; and although the county court held the will to be valid, and made an order admitting it to probate, an appeal was

taken from that decision to the circuit court, where a jury was empanelled to try at the bar of the court, and to ascertain whether any, and if any, how much of what was offered, was or was not the will of the decedent. The jury, as already stated, by their verdict, after hearing all the evidence, found that the paper propounded was not the will of the decedent. On the motion of the propounder, the court set aside this verdict and ordered a new trial; to which action of the court the contestants excepted. and the court certified not the facts, but the evidence. And an appeal was prematurely obtained to this court, but was for that reason dismissed and the cause sent back to the circuit court, when the issue was again tried by a jury, and this time the jury found that the paper propounded was the will of said Wm. Tucker, deceased; and the contestants having moved to set aside the verdict and grant a new trial because the verdict was contrary to the law and the evidence, which motion was overruled, the contestants applied for and obtained a writ of error and *supersedeas.*

There being thus two verdicts—the first in favor of the contestants, the plaintiffs in error, and the second in favor of the propounder, the question is presented, what must be the rule of decision in this and similar cases under the rule prescribed by section 3484 of the lately revised Code of 1887? Prior to this revisal, in cases like this, the well settled rule of this court was to look (in the first instance) "only to the proceedings on the first trial, and if it discovers that the trial court erred in setting aside the verdict on that trial, to set aside and annull all the proceedings subsequent to said verdict, and enter judgment thereon" —Hinton, J., in *Muse* v. *Stern,* 82 Va. 34; citing *Pleasants* v. *Clements,* 2 Leigh, 474; *Terry* v. *Ragsdale,* 33 Gratt. 344; *Brown* v. *Rice's Adm'r,* 76 Va. 665.

But while this rule seems to be conceded, it is insisted by counsel for the defendant in error that, inasmuch as the plaintiffs in error are excepting to the action of the court below, and the evidence, and not the facts, having been certified by the trial

court, the rule of decision in this court in considering the evidence in the cause is the same as on a demurrer to evidence by the party excepting; in other words, that the attitude of the plaintiffs in error here is that of demurrants to evidence. And in support of this insistence, counsel rely upon said section 3484 of the new Code, which reads: "When a case at law, civil or criminal, is tried by a jury, and a party excepts to the judgment or action of the court in granting or refusing to grant a new trial on a motion to set aside the verdict of a jury, on the ground that it is contrary to the evidence; or when a case at law is decided by a court or judge without the intervention of a jury, and a party excepts to the decision on the ground that it is contrary to the evidence, and the evidence (not the facts) is certified, the rule of decision in the appellate court, in considering the evidence in the case, shall be as on a demurrer to the evidence by the party excepting."

It is difficult to conceive of a broader or more sweeping statutory provision, or one that could more completely revolutionize the rules of decision in the appellate tribunal in all cases at law, civil or criminal, where there have been two trials and two verdicts—the first verdict for the plaintiff in error and set aside by the trial court on the motion of the defendant in error, and a new trial granted; and the second verdict for the defendant in error, and a motion to set it aside by the plaintiff in error, and the motion overruled, the plaintiff in error excepting to the action of the court on both trials.

It cannot be denied that the case at bar was a civil action at law, in which a trial by jury was had, and a verdict, at the first trial, rendered in favor of the plaintiffs in error; that the trial court, on the motion of the defendant in error, set aside that verdict and ordered a new trial; that the plaintiffs in error excepted to that action, and that the trial court certified, not the facts, but the evidence.

Nor can it be denied that there was a second trial by jury in the same court, a verdict for the defendant in error this time, a

motion by the plaintiff in error to set aside that verdict, the motion overruled, and exception taken to that action of the court. These things being so, this and similar cases come within the express terms and letter of the new rule of decision prescribed by said § 3484 of the new Code; and so plain are its provisions that there can be no escaping them.

In a numerous class of cases this new statutory rule can but operate with harshness and even oppression. But it is so provided by the supreme law-making power of the State, and the law must be enforced as written until the legislature in its wisdom may see fit to change it. The present rule is far more oppressive than was the former rule of this court, when, ordinarily, the losing party came here with a single verdict, and that against him, complaining of the refusal of the court to set aside the verdict, and with the evidence, not the facts, certified; in which case the rule was that the appellate court would only consider the evidence introduced by the party who prevailed in the court below, and would not reverse the judgment unless, after rejecting all the parol evidence of the exceptor, and giving full faith and credit to that of the adverse party, the decision below still appeared to be wrong. And there was, prior to the new rule prescribed by statute, yet another and equally well established rule of decision applicable to cases where there had been two trials and verdicts, and where the verdict on the first trial had been set aside by the trial court on the motion of the adverse party, and a new trial ordered, in which case the appellate court looked alone, in the first place, to the proceedings on the first trial in order to determine whether the trial court had erred in setting aside the verdict on that trial, but in doing so the evidence, not the facts, being certified, would look to all the evidence on both sides, because by no other means could the appellate court safely determine whether the trial court had erred in disturbing the verdict, and, in so doing, had improperly invaded the rightful province of the jury.

In discussing this rule, in *Muse* v. *Stern*, 82 Va. 34, a case

much like the present, Hinton, J., said: "The question, there-
fore, is whether the appellate court will look to the whole evi-
dence in determining whether the circuit court erred in its action
in setting aside the verdict, or will only entertain the plaintiff
upon condition that he shall surrender all of his oral evidence
and rest his case upon the evidence of the defendant. For the
plaintiffs in error it is strenuously insisted that when the plain-
tiff comes to this court with the verdict of a jury, who are the
proper triers of the facts, and whose judgment is entitled to
especial weight in all cases where there is a conflict of evidence
and questions as to the credibility of witnesses in his favor, the
court should look to the whole evidence upon the first trial, and
sustain the verdict rendered upon that trial, unless it can per-
ceive that there has been a plain deviation from right and justice,
and that the jury have found a verdict against the law or against
the evidence, or without evidence. And upon a careful con-
sideration of the subject, we have arrived at the same conclu-
sion." The principle thus laid down is abundantly sustained
by the authorities cited by Judge Hinton in that case. And in
the later case of *Jones* v. *Old Dominion Cotton Mills*, 82 Va. 140,
the authorities were collected and carefully considered, and the
same doctrine held.

The two rules of decision just above referred to, though very
different in structure and adaptation, being founded on somewhat
distinct principles and respectively applied to cases under wholly
different conditions, were yet devoted to the one common object
of restraining the hand of the trial courts from interference with
the verdicts of juries, except in cases of palpable deviation from
right and justice. In the one case the plaintiff in error came
to the appellate court with a single verdict and judgment
against him, and by reason of the weight and influence ascribed
to the verdict of the jury, he was required to surrender all of
his oral evidence, and to hope for a reversal, if at all, by reason
of the insufficiency of his adversary's evidence to warrant the
verdict and judgment complained of. These were hard terms—

were ill adapted to the ends of justice, and never had the intelligent approbation of the profession; but they afforded even more than due protection to the verdicts of juries. In the other case, as here, there having been two trials and two verdicts and judgments, and the first verdict having been for the defendant and set aside on the motion of the plaintiff; and on the second trial a verdict for the plaintiff, and a motion by the defendant to set it aside, and that motion overruled and judgment according to the second finding, then a very different condition of things was presented, and as the writ of error brought up the whole record (the evidence, as in the other case, not the facts, being certified), and the plaintiff in error being the exceptor to the action of the trial court, both in setting aside the verdict on the first trial, and in refusing to set aside the verdict on the second and last trial, and in giving judgment thereon, the appellate court was bound to look, in the first place, only to the proceedings on the first trial, and in doing so to consider all the evidence at that trial on both sides; and thus, as in the other case, giving to the verdict of the jury that degree of sanctity ascribed to it by both rules, and which rendered it inviolable except when plainly a departure from the law and the facts.

But all this is changed, and it cannot be said that the change is for the better. For, under the newly prescribed rule of decision, though there has been two jury trials, two verdicts and two judgments; though the verdict on the first trial was for the defendant (plaintiff in error), and was set aside on the motion of the plaintiff (defendant in error); though the defendant excepted to that action and obtained a certificate of all the evidence on that trial; though there was a second trial by jury and a verdict on that trial for the plaintiff, a motion by the defendant to set aside that verdict, and the motion overruled and judgment entered on said second verdict, and exception taken and certified to such action; yet when the plaintiff in error comes to this court with the whole record and with a verdict in his favor at the first trial, which verdict, he claims, was improp-

erly set aside, he is confronted with the statutory rule of decision, which, in effect, declares that the fact that he comes with a verdict in his favor is of no avail, and that, coming in the attitude of exceptor to the action of the court in setting aside that verdict, he must occupy the position of a demurrant to evidence, and is thus not only stripped of the rightful weight and influence of such verdict, but substantially of all the evidence upon which the jury probably based their verdict. This singularly harsh result necessarily follows in every case like the present; for the rule, in express terms, embraces every case at law, civil or criminal, where there is a trial by jury and a party excepts to the judgment or action *of the court* in either granting or refusing to grant a new trial on a motion to set aside the verdict of a jury on the ground that it is contrary to the evidence; and the evidence and not the facts is certified. The rule is sufficiently broad and sweeping in its terms to embrace and wipe out the rules above referred to, but in its spirit and letter is far too narrow to admit of substantial justice; and can but work great injustice in a large number of cases. The palpable wrong which results from the rule is, that it puts one who comes with a verdict and excepting to the action of the trial court in setting that verdict aside, in the same attitude with one who comes with a verdict and judgment against him and excepting to the refusal of the court to set aside such verdict. In short, it puts him in the attitude of a demurrant to evidence, whereby he waives all evidence on his part that conflicts with that of his adversary, admits the credit of the evidence demurred to and all inferences of fact that may be fairly derived therefrom, and refers it to the court to deduce all such inferences. *Trout* v. *Va. and Tenn. R. R. Co.*, 23 Gratt. 637. In other words, the rule, in effect, makes the trial court instead of the jury the trier of the facts.

However, subject to and in the light of the rule, the question recurs, did the circuit court err in setting aside the verdict of the jury rendered on said first trial? Any considerate view of the facts and circumstances disclosed by the evidence, or so much

thereof as we may consider under the rule, makes an affirmative answer to this question unavoidable. In other words, under the rule applicable to a demurrer to evidence, it is clear that the paper propounded is not established as the true last will of Wm. Tucker, deceased; that the jury on said first trial properly so found, and that the circuit court plainly erred in setting aside that verdict and granting a new trial.

It is not claimed by the contestants, the plaintiffs in error, that the decedent was *insane*, but they do claim that he was, during his last brief illness, at times in a state of stupor and unconsciousness, and that he was in such condition at the time of the execution of the pretended will. Several witnesses, who were not present at the time of the execution of the instrument, but who knew the decedent and saw him, during his last illness, either shortly before or after the alleged will was executed, testify on behalf of the propounder that, in their opinion, the decedent was, when they thus saw him, of sound and disposing mind and memory. Other witnesses, who were introduced on behalf of the contestants, and who also saw the decedent shortly before or shortly after, and some of them almost directly after, the execution of the instrument, and when those who were introduced on behalf of the propounder were not present, certify that the decedent, as seen by them, was not of sound and disposing mind and memory. All of this testimony is of but little, if any, value, as the question must turn mainly on the evidence of those who were present at the time of the execution of the instrument, the important question being as to the mental condition at that time. The evidence does not distinctly disclose the duration of decedent's last illness; but it was brief, and probably not exceeding a week or ten days. He died on Friday, the 23d of August, 1884, the paper in question having been executed on the 18th of the same month. Though the testimony of the attending physician appears in the record, it is devoted mainly to decedent's mental condition before and after the particular time (when he was not present) of the execution of the alleged will,

and to explanations of remarks made by him, to witnesses who testified, to the effect that from his knowledge of decedent's condition he was not capable of making a valid will, so that his testimony throws but little light upon the character and duration of the decedent's last illness. But it is clear that the attack was as rapidly wasting as it was brief, and two facts are undisputed —first, that the decedent, some two days before the date of the will, had a spell during which he was unconscious; and, second, that he died in a state of unconsciousness.

The only persons present at the time of the execution of the alleged will were the propounder, John S. Sandidge, and the attesting witnesses, S. A. Love and C. T. Smith. The paper was written by the propounder and kept by him until offered for probate after decedent's death; and Love became a witness to the paper at the instance of Sandidge, the writer and propounder. Sandidge lived in decedent's neighborhood; but, it is clear, was not by him esteemed and treated as a neighbor, in the true sense of that term. On the contrary, there is abundant evidence that the decedent entertained for him feelings of the utmost contempt. Sandidge had from time to time hauled tobacco for decedent to Lynchburg, and in his account of how he came to write the alleged will, he makes his tobacco hauling a pretext for introducing the subject of conversation which, he says, led to decedent's request that he should write the will. No one heard decedent make the request, and no one was present or knows that this particular paper was ever read by or to the decedent, or that he ever acknowledged it as his will.

Omitting all mere details of statement, which are immaterial, the substance of Sandidge's testimony is this: Though living very near decedent he only visited him some four times during his last illness. One of these visits was on Sunday, the day preceding that on which the will was written, two of them on the day the paper was written, and the other on the day of decedent's death.

Sandidge testifies in substance that he had been in the habit

of hauling tobacco for decedent, and to the best of his recollection he had visited decedent several times during his last sickness, and was there about breakfast time on Monday, the 18th of August, 1884 (the date of the will); that decedent said he was no better, and that witness asked decedent if he had anything open that he wanted to settle up; that he (witness) had previously heard that decedent had made a will, and that Capt. Berry had it; that decedent said he wanted to make provision for his first children; that his last wife and last children had done nothing for him; that witness asked him what provision he wanted to make, and decedent said he wanted to make a will; that witness asked who he wanted to write it, and that decedent said that he (witness) could write it as well as anybody, and also said he had no pen, ink or paper; that witness told him to state what he wanted, and he (witness) would take it down, go home and write it out, and also asked decedent who he wanted to witness it; that decedent said he wanted C. T. Smith, and hesitating as to the other witness, Sandidge suggested Love, to which decedent agreed; that decedent told witness he wanted him to read the will to him alone; that he (decedent) did not want to have any fuss about it. That witness went home, saw Smith and Love, and went back after dinner, found decedent asleep, and witness remarked he looked like he was dying, but after awhile decedent waked up, and witness thought he looked better; that after he waked up, he asked for some water, which Smith or some one handed to him; that witness thinks decedent's daughters were then in the room, and says that after decedent roused up, he (witness) asked all hands out of the room; that witness read the will in a loud voice, pausing at every clause, asking, "is that right?" that decedent said it was all right, and asked witness to bring in the witnesses; that witness called in Love and Smith, and raised up decedent and asked him if that was his will, and that decedent said, "yes;" that witness then asked if he wanted those gentlemen to witness it as his will, and decedent said yes; that they signed it, and

decedent asked witness to keep it, and he did so.   This writer
and propounder of the paper further testifies that he was no kin
to decedent's family or to either of his wives or children ; that
decedent's eyes were inflamed and sore; that  he saw  decedent
several times after will was  executed, and  thought he was in
his senses up to Friday night; saw him  Friday  evening  and
asked him if he knew him (witness), and  he nodded his head ;
that decedent said his first children had worked for and taken
care of him, and that his daughter, Millie Ann, had actually
stripped all his tobacco, and that he thought it his duty to take
care of them ; that his last wife and children had done him no
good.

Such is the statement, in chief, of the propounder, John S.
Sandidge.   Let us look now to the testimony of the two attest
ing witnesses, and compare  their  statements with that of the
propounder.   The first of them, S. A. Love, was a resident of
Lynchburg and, at the  time, on a visit to the propounder, who
was his brother-in law.   He testifies that, at  the  request of
Sandidge, he and Smith went with Sandidge to decedent's house
to witness his will; that on arriving there he  and Smith sat on
the porch, and Sandidge went into decedent's room, and in a
short while came out and said he believed  decedent was dying ;
that they all three went in and found decedent had been "asleep
instead of dying;" that Smith and  witness went out of the
room, witness going on porch, near window ; that witness heard
Sandidge reading what he supposed was the will ; that Sandidge
would ask, "is that right?" that witness did not hear any
answer ; that Sandidge then came out and took us back into the
room, and that Sandidge asked witness to raise decedent up in
the bed, which witness declined to do, and then Sandidge raised
him up ; and Sandidge then asked Smith to hand the pen, ink
and book; that decedent's eyes were inflamed, and witness sup-
posed he was partially blind ; that witness saw that decedent
could not sign his name; that Sandidge requested witness to
take decedent's hand and help him to sign his name, which wit-

ness did; that Sandidge asked decedent if that was his will, to which decedent replied, "yes;" and that that was the only question put to decedent.

On cross-examination, this witness stated that when he and Smith left decedent's room after first going in, perhaps Sandidge asked them to go out. And he further states that decedent did not speak to him (witness) while he was in the room, nor did he show any sign of recognition of him; that after signing the will, he (witness) went out of the room immediately, and that at the time the will was executed there was no one in the room except decedent, Sandidge, Smith and witness.

C. T. Smith, the other attesting witness, testifies that he and Love, the other attesting witness, went to decedent's house at the instance of Sandidge; that on arriving there he and Love sat on the porch, and that Sandidge "went in and came out, and said decedent was dying"; that witness and Love then went into decedent's room with Sandidge; that "decedent was roused up, but did not recognize them"; that Sandidge asked witness and Love "to go out of the room," which they did; that witness went into an adjoining room, and Love into the porch; that witness heard Sandidge reading something, which witness "supposed was the will," but only heard a word every now and then; and heard Sandidge ask, "Is that right?" heard something said about $200, and asked Sandidge afterwards who decedent gave $200 to; that Sandidge came out and asked witness to go into decedent's room; that the will was produced by Sandidge, who asked decedent if that was his will, and decedent nodded his head. This witness further testifies that he did not hear decedent speak; that he was standing with his arm leaning on the mantelpiece, and that Sandidge and Love were standing between him and decedent; that he (witness) could not speak as to decedent's mental condition, only saw him nod his head; that after the will had been signed decedent asked for water, and witness gave him some; that decedent's eyes were always inflamed, and that he was rather a talkative

man when well; and that this visit was the second time witness had seen decedent since he was taken sick.

On cross-examination, this witness (Smith) testified that decedent did not speak to him, and that he didn't know whether decedent would have spoken to him or not if he (decedent) had been in his right mind; that decedent's eyes were inflamed and he may not have seen witness; that decedent was lying on his back, and witness stood by his side when he witnessed the will; that witness did not know whether decedent knew he was in the room; that witness did not remember the precise time, but that he visited decedent two or three days before that on which the will was executed, and that decedent spoke to him then when he entered the room; that witness was a near neighbor of decedent, and decedent knew him well, and had always spoken to him before. And this witness further said that he did not hear decedent say anything while he was in the room except to ask for water, for which he made a sign, and witness gave it to him.

Such is the evidence of the propounder and the two attesting witnesses, the only persons present at the time of the execution of the alleged will, and, consequently, the only material evidence in the cause, the question being not as to the mental capacity a short time before or after, but at the time of the execution of the instrument. It needs but a glance at this evidence to make it clear beyond dispute that the deceased, at the time of the execution of the paper, was in a state of unconsciousness.

If we were to look alone to the testimony of the propounder, by whom the paper was written, and under whose immediate supervision and direction it was executed, we could not avoid the conclusion that the deceased was possessed of a sound and disposing mind and memory. For, notwithstanding his declaration, made immediately after he first entered the sick room, on the day of the execution of the paper, that the decedent was dying, or looked like he was dying, yet this is, in part, adroitly explained away by saying that, on going back into the room, it

was discovered that he had been sleeping instead of dying; and in this respect, Love, his brother-in-law and one of the attesting witnesses, substantially agrees with him. But, looking further to the statement of Sandidge, the propounder, we find him testifying that the decedent roused up; that he (Sandidge) asked all hands out of the room, and read the will to decedent in a loud voice, pausing from time to time and asking, "Is that right?" to all which the decedent responded affirmatively; that the decedent then asked that the witnesses be brought in, and that he brought them in and then asked the decedent, Is this your will, and do you want these gentlemen (the attesting witnesses) to witness it? to all which the decedent also answered affirmatively; and that, holding the decedent up in bed while Love guided his hand, he signed and acknowledged the paper as his will, and asked him (the propounder) to keep it, which he did. Taking this statement alone all seems well, and it indicates sufficient mental capacity to make a valid will. But if the statement, in the light of all the attendant circumstances, was worthy of full credit and there was nothing to contradict it, it is wholly insufficient to establish a contested will. For the doctrine recognized in the numerous authorities already referred to is, that the party propounding the instrument must establish the fact by competent evidence that it is truly the will of the decedent, and that the alleged testator was, at the time of making and publishing it, of sound and disposing mind and memory. The requisites of the statute, both as to soundness of mind and formality of execution, must be at least substantially complied with. The burden of proof is on the propounder from the start, and is not removed or shifted by proof of the *factum* of the will, and of testamentary capacity by the attesting witnesses, but rests on the propounder until the conscience of the court is judicially satisfied that the paper in question is in reality what it purports to be, and what its propounder asserts it is.

But in this case, when we pass from the testimony of the propounder himself to that of the subscribing witnesses, so far

from finding in the latter evidence of testamentary capacity, we find disclosed facts and circumstances which discredit the statement of the propounder, Sandidge, and show conclusively that, instead of being possessed of sufficient mental capacity to understand what was being done, the decedent was in a state of unconsciousness, and neither spoke to nor recognized either of the attesting witnesses, one of whom was his near neighbor and well known to him; nor did he, by word or act, intimate that he was conscious even of their presence. So say both of the subscribing witnesses. How, then, can it be said that this unjust and unnatural paper is a valid will in the eye of the statute, which declares that "no will shall be valid unless it be  *  *  * signed by the testator, or by some other person in his presence and by his direction, in such manner as to make it manifest that the name is intended as a signature"; and which further declares that, unless the will be wholly written by the testator, the signature shall be made or the will acknowledged by him in the presence of at least two competent witnesses present at the same time, and who shall subscribe the will in the presence of the testator. Presence, in the sense in which the word is used in our statute of wills, does not mean simply being together at the same time and place, and especially does it not mean the being together of animate and inanimate things or persons, or of living, competent witnesses with a supposed testator who is asleep or unconscious. It means conscious presence. Lacy, J., in *Baldwin* v. *Baldwin's Ex'or, &c.,* 81 Va. 405, and cases cited.

Again, the testimony of the two subscribing witnesses shows conclusively that the condition of the decedent was such that he did not and could not have directed Sandidge to bring in the witnesses, as the latter says he did immediately after the paper was read to him, and such that he could not have made the responses, during the reading of the paper, which Sandidge puts in his mouth. Indeed, Love says that the only question put to decedent was when Sandidge asked him if that was his will, and he said, "yes." Smith says that in answer to this question dece-

dent nodded his head. Both of them heard Sandidge reading what they supposed to be the will, and they heard Sandidge ask, "is that right?" but neither of them heard any response by the decedent. And Smith says that, during the time they (the subscribing witnesses) were in the room, the only thing said by decedent was to ask for water, which he did by a sign.

This, it is true, is the evidence of the subscribing witnesses, who, as was said by Staples, J., in *Young* v. *Barner*, 27 Gratt. 96, are regarded in the law as placed around the testator to guard against fraud, and to ascertain and to judge of his capacity. And in the same case Judge Staples says that "a person who signs his name as a witness to a will, by his act of attestation solemnly testifies to the sanity of the testator. If he afterwards attempts to impeach the validity of the will, his evidence is not te be positively rejected ; but is to be received with the most scrupulous jealousy;" citing 1 Jarmin on Wills, 77, and cases there cited in note 1.

This rule, though just in its general application, ought not to be vigorously applied to a case like this, when the circumstances clearly show that the witnesses were suddenly called on and, with a haste dictated by the author and propounder of the paper, which left them no time for due deliberation ; and when called upon to testify, as they were, in behalf of the propounder, they were in duty bound to detail truly the facts and circumstances, in doing which they afford the only available and reliable data from which to draw proper judicial conclusions. They do not, therefore, strictly speaking, occupy the attitude of subscribing witnesses seeking to invalidate the will, but rather that of such witnesses disclosing the circumstances which led them to act inadvertently, and the facts touching and incident thereto ; though, it must be said, as was remarked by Chancellor Walworth in *Scribner* v. *Crane*, 2 Page's R. 147, that "no person is justified in putting his name as a subscribing witness to a will unless he knows from the testator himself that he understands what he is doing. The witness should also be satisfied, from his own

knowledge of the state of the testator's mental capacity, that he is of sound and disposing mind and memory. By placing his name to the instrument, the witness, in effect, certifies to his knowledge of the mental capacity of the testator ; and that the will was executed by him freely and understandingly, with a full knowledge of its contents. Such is the legal effect of the signature of the witness when he is dead, or is out of the jurisdiction of the court."

In the case at bar, it is obvious that neither of the subscribing witnesses had the requisite knowledge to enable them to testify that the will was duly executed. Indeed, it is scarcely conceivable, even under the circumstances that surrounded them, that they did not refrain from an act so repulsive to men of honor and sensibility, and so calculated to inflict irreparable wrong upon those who were justly interested. The circumstances, however, very clearly indicate that they probably intended no wrong.

There is much evidence in the record, introduced on behalf of the contestants and not contradicted nor in conflict with that on behalf of the propounder, which greatly augments the discredit cast upon the propounder, Sandidge, by the subscribing witnesses, and puts him in the unenviable attitude of acting in this matter through interested and unworthy motives. But it being unpleasant to do so, and not essential to the justice of this case, this view will not be further pressed.

Taken all in all, this case, though involving no great amount, is a very remarkable one. The deceased laboring under his last illness, which is so severe and so rapidly rushing him on to dissolution, that, in a very few days after his first attack, he is for a spell reduced to a state of unconsciousness, some two days after which, and evidently in the midst of another such spell, one, though living near, not truly his neighbor, and a stranger alike to his blood and his confidence, assumes the role of neighbor and confidential friend, hurriedly prepares a paper purporting to be a will, and with equal haste procures the attendance of the

subscribing witnesses, holds the dying and unconscious testator up in his bed, while one of the witnesses, under his direction, puts a pen in the unresisting hand, and guides that hand through the mocking form of signing and executing the will of such a testator, and this, when that and the other witness testifies that they had no evidence of the fact that this pretended testator was even conscious of their presence. The whole scene is, in all its features, too revolting for contemplation; and it would be a criminal mockery of justice and humanity to give it the sanction of judicial toleration. We are therefore clearly of opinion to reverse the judgment of the circuit court setting aside the verdict of the jury rendered on the first trial therein, to enter judgment here on that verdict, and to declare null and void all subsequent proceedings in said circuit court.

JUDGMENT REVERSED.