# Wytheville.

GRAY AND OTHERS v. RUMRILL.

June 11, 1903.

1. APPEAL AND ERROR—*Judgment by Trial Court Without Jury.*—Where a cause is submitted to the trial court for the determination of all matters of law and fact, without the intervention of a jury, its judgment is entitled to the same weight as though rendered upon a verdict of a jury, and an appellate court will not disturb it unless it is plainly against the evidence, or is without evidence to support it.

2. WILLS—*Testamentary Capacity—Attending Physicians—Subscribing Witnesses.*—To establish testamentary capacity the proof must be clear and convincing, and the burden is on the propounder of the will to show the capacity of the testator. The testimony of attending physicians on the subject is entitled to great weight, and, where no exceptional condition of mind is shown to exist at the time of the execution of the will, their testimony as to the mental and physical weakness of the testator before, at the time of, and after, the execution of the will, and until his death, is not to give way to the evidence of attesting witnesses.

Appeal from a decree of the Court of Law and Chancery of the city of Norfolk, pronounced October 8, 1900, in a suit in chancery, wherein the appellee was the complainant, and the appellants were the defendants.

*Affirmed*

The opinion states the case.

*W. W. Old* and *L. L. Lewis,* for the appellants.

*White, Tunstall & Thom* and *P. J. Morris,* for the appellee.

CARDWELL, J., delivered the opinion of the court.

This is an appeal from a decree of the Court of Law and Chancery of the city of Norfolk, declaring null and void a writing dated the 16th day of November, 1899, purporting to be the last will and testament of Joseph E. Rumrill, deceased, late of the city of Norfolk, who departed this life on the 29th day of November, 1899, after having made and published the paper above referred to, whereby he gave his diamond ring and gold watch and chain to his cousin, W. C. Gray, and devised and bequeathed all the rest and residue of his estate, both real and personal, after payment of his debts, funeral expenses, and the cost of a tombstone upon his grave, to be equally divided between his aunt, Julia A. Topping, and his uncle, E. M. Gray.

This alleged will was probated in the Corporation Court of the city of Norfolk on the 5th day of December, 1899; and Gray and Morse, the executors named therein, qualified as such.

After the probate of the will, the appellee here, Earle Wayne Rumrill, an infant, suing by Ella Miars, his mother and next friend, filed his bill in the Court of Law and Chancery of the city of Norfolk against the executors and beneficiaries named in the will, alleging, among other things, that he was the only child and heir at law of the said Joseph E. Rumrill; that the paper writing which had been probated as the will of Joseph E. Rumrill was not his will, because on the 16th day of November, 1899, the date of its execution, and for a long time prior thereto, and at all times subsequently, the said testator was of weakened, disordered, and deranged mind, and utterly without testamentary capacity; that the testator was unduly controlled and influenced by the beneficiaries therein named, or by some of them, in the execution of the said will, etc. To this bill the appellants filed their demurrer and answer, and upon a hearing thereon the demurrer was overruled, and an issue *devisavit vel non* directed.

Upon the trial of this issue, the whole matter of law and fact having been submitted to the court without a jury, the judge who tried the issue found against the appellants, as the proponents of the will, who were the plaintiffs in the issue, and entered an order accordingly, which, with the evidence introduced, and certain exceptions taken during the trial, was certified to the chancellor, who overruled the motion of the proponents of the will to set aside the judgment of the court, and entered the decree appealed from, setting aside and annulling the alleged will.

While there were some exceptions taken to rulings of the court in the trial of the issue *devisavit vel non,* the real question in the case is, was the paper writing purporting to be the last will and testament of Joseph E. Rumrill, deceased, executed by him according to the forms of law, at a time when he possessed legal testamentary capacity and was free from undue influence?

The learned judge below rested his decision on the fact that at the time the paper was executed the testator did not possess testamentary capacity.

The case having been submitted to the court below for the determination of all matters of law and fact, its judgment is entitled to the same weight with this court as though rendered upon the verdict of a jury, and this court will not disturb the finding of the trial court unless it has plainly decided against the evidence or without evidence. *Reusens* v. *Lawson,* 96 Va. 293, 31 S. E. 528, and authorities cited.

The facts necessary to correctly outline the case are these: Joseph E. Rumrill died at the early age of 38 years as the result of a dissolute and intemperate life. He had been a member of the Virginia Pilot Association, and for some months before the execution of his alleged will had been discharged or superannuated by the pilot association because he could no longer be trusted to do the work of piloting a ship, the result of his life

of debauchery. He had married in 1887 the mother and next friend of appellee, but in November, 1897, she sued for, and in January, 1898, obtained, a divorce from him. ·On February 8, 1898, about one month after this divorce had been granted, the infant appellee was born. The ground of this divorce was the adultery of the husband and father with a lewd woman living in a most disreputable portion of the city of Norfolk, whom he had met in 1895, and cohabited with until the spring of 1899, when he was then sent by his friends to an inebriate asylum near Baltimore, with the hope of restoring him to health and self-control, but he returned to Norfolk and plunged again into a life of debauchery. After a time he became repentant, and ,anxious for his former wife to remarry him, importuning her to do so on account of their child, and with the result that she put him on probation; telling him "that if he would go down and follow his business for three months, and act like a man, she would marry him." Finally, however, from intemperance and other causes, he became very sick, and was confined to his room and bed on Main street, in the city of Norfolk. There his former wife visited him with their child, and he continued to urge her to remarry him on account of the child. He was all the time growing worse, and on Friday, the 20th of October, 1899, Capt. Edwards, the head of the Pilot Association, was, on account of Rumrill's extreme illness, sent for to see him. Capt. Edwards went, and, with the view of having him cared for, advised an immediate marriage with his former wife. This plan was adopted, and, at the request of Rumrill, Capt. Edwards and one Matthews went to Mrs. Miars' house, informed her of the extreme situation of the sick man, and urged her to remarry and take care of him. She consented, and the marriage was fixed for the next day, Saturday, October 21st, at 2 o'clock P. M.

Up to this time neither the beneficiaries of this alleged will, nor any other of the testator's relatives, had taken the slightest

interest in him, or shown any concern about him; but upon
Matthews mentioning that evening to E. M. Gray, one of the
beneficiaries in the will, the proposed marriage, the relatives
became greatly interested and most active.  On Saturday morn-
ing, Topping, the husband of one of the beneficiaries, went to
Rumrill's room, and kept watch over him, so that none of his
former wife's family or friends could see him; and on Sunday
morning E. M. Gray, the other beneficiary, took him in a car-
riage and carried him up to a room on Charlotte street, which
Mrs. Topping had rented.  On that morning, after Rumrill
had been removed by Gray to the room on Charlotte street,
Mrs. Miars (thus spoken of in the record because she resumed
her maiden name when divorced) sent her brother, William
Miars, to find him, and, upon inquiry of Gray as to where Rum-
rill was, Gray replied that he did not know; and, upon cross-
examination as a witness in this case, Gray admitted that he
made this reply because he did not want Miars to know where
Rumrill was, and that he personally told Topping that Capt.
Edwards was trying to get Rumrill remarried to his former
wife, whereupon Topping went and kept guard over him until
he (Gray) took him up on Charlotte street.  Mrs. Miars never
knew where Rumrill was until she received a note from him,
asking her to come to see him on Charlotte street.  This she
did, and, when she reached the door and asked for him, admis-
sion was refused her, and the door was slammed in Mrs. Miars'
face.  From that time on, no one who was anything to the
infant appellee was permitted to come near Rumrill.  We do
not, however, mention the facts as to how Rumrill was taken
charge of and secluded by the beneficiaries in this alleged will
with the view of considering the question whether or not he
was unduly influenced to execute that paper (it is not, in the
view we take of the case, necessary for us to consider that
question), but as circumstances corroborative of the proof, to
be later referred to, that at the time his physical as well as

mental condition was so very weak that he had so little will
power, and was so easily influenced, that the last person with
him absolutely controlled him.

On November 15, 1899, C. H. Ferrell, James A. Wilson, W.
C. Gray, E. M. Gray, and Mrs. Topping met in the room of the
testator. Just how this meeting was brought about does not
clearly appear. But when the object of the meeting was men-
tioned to Rumrill, he said that he did not want to make a will
that day—felt too tired. Thereupon all left the room, except
Ferrell, who took a seat by Rumrill, and obtained from him
the data from which he had the will written by a lawyer; and
the next day, November 16, 1899, the same parties who were
there the day before met in Rumrill's room, the will was read
to him, and he affixed his signature to the paper. At the time,
Rumrill had liquor in his room, and a glass of toddy sitting
near him, which he called for immediately after fixing his
signature to the paper, and drank of it.

Upon the question whether or not the testator had testa-
mentary capacity to dispose of his estate, it is well-settled law
that, to establish such capacity, the proof must be clear and
convincing.

In *Tucker* v. *Sandidge*, 85 Va. 556, 8 S. E. 654, it is said:
"The *onus probandi* is upon the party who seeks to set up the
instrument in question, and this from the fact that the pro-
pounder alleges that the paper offered for probate is the true
will of a free and capable testator, and hence it devolves upon
him to make good his allegation (that is, to prove by competent
testimony that the instrument is what it purports to be), for
in every such case the conscience of the court is to be satisfied,
and nothing short of clear and convincing evidence will suffice.
This doctrine has been uniformly recognized and acted on by
this court." See also *Chappell* v. *Trent*, 90 Va. 901, 19 S. E.
314.

There is absolutely no conflict in the testimony in this case

that the testator, Rumrill, before his final illness, during which his alleged will was made, had gotten into the condition that his will power was so far gone that he was most easily influenced, and could be led like a child, and changed with his company. His bad mental condition during his last illness is proved by seven or eight witnesses, besides Dr. Graves, his attending physician, who saw him every day, and oftentimes twice, and by Dr. Leigh, who saw him a number of times as consulting physician.

Both of these physicians, of high standing in their profession, testify emphatically that the testator was not capable of making a will; that his impaired mental condition was of a permanent nature, and constantly growing worse. The statement of Dr. Graves, corroborated by Dr. Leigh and others, is that the progress of the testator was downward; that he never improved, but showed a decided diminution in the power of recovery or recuperation; and that this was his condition mentally as well as physically.

While it is conceded that the testimony of attending physicians with respect to testamentary capacity is entitled to great weight, it is urged that unless the attending physician be present at the making of the will, and testifies as to the mental capacity of the testator at that time, the testimony of the subscribing witnesses is to be preferred. Whatever might be the influence of this argument in a case where it was not proven that the testator's mental condition before, at the time of, and after the making of his will, until his death, was the same, it can have but little, if any, force in this case. According to appellant's own testimony, the testator did not have an exceptional condition of mind at the time of the making of his will. On the contrary, Mrs. Topping, one of the beneficiaries, testifies that she was with him all the time during his last illness, and that his mind never varied a single minute. It is true, she also says that it was "as sound as it could be"; but, unfortu-

nately for the credibility of her statement, it is clearly shown that she did not regard his mind as sound as she represented it to have been, as she, at least twice, at intervals of a week, had approached the attending physician, Dr. Graves, to inquire if he thought the testator was competent to make a will, and was told each time that he was not. Her husband, at her instance, interviewed Dr. Leigh on the same subject before the will was executed, and received the same answer that was given by Dr. Graves to Mrs. Topping. Mr. Topping was also heard to declare, when he was told of the proposed marriage of the testator to his former wife, that Capt. Edwards was trying to marry this woman to an insane man.

Dr. Graves minutely states the condition of the testator mentally, and reaches the conclusion that he was at no time during his last illness competent to make a will, and he saw the testator at least once on the very day that the alleged will was executed. The substance of Dr. Graves' testimony as to the condition of the testator during his last illness is that physically he was weak, worn, and weary, and in a general state of exhaustion, with fixed features and a sort of weakly hanging jaw. Mentally, he was in a state of apathy or lethargy—a decided stupor. He was inactive, sluggish, morbid, and inert. His eyes had some degree of vacancy—intermediate look—and were generally directed towards his feet. There was an occasional uplifting and shifty look of the eyes when he was aroused. He would return to his condition of stupor as soon as efforts to hold his attention were relaxed. He took no part in conversation, except to give monosyllabic answers to questions, and would, as soon as his attention was released, relapse into listlessness.

This testimony, corroborated by the other attending physician, as well as by a number of witnesses testifying as to the physical and mental condition of the testator, is by no means overcome by the subscribing witnesses to his alleged will, and

who, practically, only give it as their opinion, unaided by skill or experience in such matters, that the testator at the time was mentally competent to make his will.

We are of opinion that the decree of the lower court, holding that the paper propounded by appellants as the last will and testament of Joseph E. Rumrill, deceased, is not his true last will and testament, is plainly right, and must be affirmed.

*Affirmed.*