## Draper's Estate.

*Wills—Devisavit vel non—Testamentary capacity—Evidence.*

Where the weight of testimony is in support of testamentary capacity, the testimony of insufficiently informed witnesses undertaking to testify as experts that in their opinion the testator did not have testamentary capacity will not be considered as a ground for granting an issue devisavit vel non.

Opinions when opposed to established facts are not entitled to much respect.

The mere fact that a testator at the time his will was made was an inmate of an insane asylum is not a sufficient ground for granting an issue devisavit vel non, where the uncontradicted testimony shows that the testator had testamentary capacity when he executed his will.

Argued March 27, 1906. Appeal, No. 72, Jan. T., 1906, by John H. Draper, from decree of O. C. Phila. Co., April T., 1904, No. 228, refusing an issue devisavit vel non in Estate of Henry Draper, deceased. Before MITCHELL, C. J., FELL, POTTER, ELKIN and STEWART, JJ. Affirmed.

Appeal from register of wills.

From the record it appeared that the testator died on June 20, 1902, leaving a will by which he gave the greater part of his estate to three nephews, children of his deceased sister, Emma E. Speakman, but leaving nothing to John H. Draper, the contestant, a son of a deceased brother. The will was executed on June 8, 1889, in the presence of Dr. John C. Hall and Dr. William Pepper.

PENROSE, J., filed an opinion which was in part as follows:

The whole theory of the contestant is, substantially, based upon this fact—that the decedent, when the will was made, and for many years previously, was a resident of The Friends' Asylum for the Insane, at Frankford—having been admitted, at first in 1866, and afterwards in 1872, remaining until his death in 1902. He was a nervous dyspeptic, suffering from frequent attacks of great mental depression ; but, as the records of the institution and the uncontradicted testimony of the witnesses show, he was free from delusion or hallucination of any

kind.   His periods of depression did not affect his intellectual
powers; and when not suffering from them he was bright, in-
telligent, and possessed unusual strength of memory.   His com-
mitment, in 1872, stated that he was suffering from "melan-
cholia;" but this, while, from the physicians' point of view,
affording justification, perhaps, for a certificate that the patient
is "insane," is not, of itself, a necessary indication of testa-
mentary incapacity; and, as the records of the asylum show,
it was understood that the decedent was there voluntarily, and
he was kept under no restraint.

The preparation of the will was the subject of most intelligent
discussion and consideration on the part of the testator.   It
was just such a disposition of his estate as was natural under
the circumstances.   His residuary legatees were the children
of his only sister, with whom he had at one time resided, and
to whom, so long as she lived, he was in the habit of making
an allowance of $50.00 each month, which, after her death in
1887, he continued to the sons or to the one of them most re-
quiring it.   On the other hand, the nephew not included among
his beneficiaries was the son of a brother who had contracted a
marriage disapproved of by the family,—the nephew, himself,
having been absolutely unknown to the testator until (about
the time the will was executed) he had reached his twenty-first
year and not seeing him more than two or three times in the
whole course of his life.

The will, as already stated, was executed in the presence of
two physicians of great eminence, by whom it was attested;
and this after they had satisfied themselves, as the result of
most careful examination, that the mental powers of the testa-
tor were unimpaired, and that he fully understood the nature
of the act which he performed.

In addition to the testimony of physicians, testifying not to
mere opinions but to facts under their personal observation,
there is the testimony of two well-known and highly respected
members of the bar, who came in contact with the decedent in
the course of an important litigation in which, in the year fol-
lowing the execution of the will, he was examined as a witness;
and there are also written evidences, in his own handwriting,
of his intelligence and mental capacity, while the testimony of
Mr. Allen, who for many years had the management of his

financial affairs, shows the thoroughness of his knowledge of all that concerned him and his shrewdness with regard to matters of business.

The testimony of the decedent, in the case referred to, brings him before the court in person, and, in itself, furnishes the most convincing and complete refutation of the assertion of mental unsoundness. It was taken, as already stated, a year after the execution of the will, when the testator was in his eightieth year; and it shows, among other things, the absolute groundlessness of a statement by a witness on the part of the contestant (much relied on by the "experts" testifying on his behalf) that he had forgotten that he ever had a brother John—the father of the contestant. In answer to the question on cross-examination, "Can you tell me the names of your brothers and sister in their order," he said, without hesitation, "Yes, I recollect all my brothers and sisters. There were William and Edmund, John, Robert, and—Oh, George, yes, Robert and Howard, and one sister, Emma."

But little need be said with regard to the testimony on the part of the contestant. It consisted, chiefly, of the expression of opinion by gentlemen undertaking to testify as experts, who did not know the testator but based such opinions on the facts stated in the records of the asylum, the unnatural character of the will, as they regarded it, and upon the alleged forgetfulness by him of his ever having had a brother, John, etc., from all of which they inferred, with much positiveness, that he had not "testamentary capacity." Opinions, when opposed to established facts, are not entitled to much respect. The witnesses did not attempt to define testamentary capacity, and what was decided in Eddey's Appeal, 109 Pa. 406, may well be applied to them: "Where the overwhelming weight of the testimony as to facts shows testamentary capacity on the part of a testator, the testimony of insufficiently informed witnesses to the effect that in their opinion the testator did not have testamentary capacity, has but little value in determining whether an issue devisavit vel non shall or shall not be granted."

The issues asked for are refused, and the appeal dismissed at the costs of the appellant.

*Error assigned* was decree refusing the issue.

*Vivian F. Gable* and *John K. Andre,* with them *Henry F. Walton,* for appellant.

*John G. Johnson,* for appellees.

PER CURIAM, May 14, 1906:
Decree affirmed on the opinion of Judge PENROSE.