## Snyder's Estate.

*Wills—Probate—Issue devisavit vel non—Evidence—Testamentary capacity — Fraud — Attestation of signature — Expert testimony.*

1. Even though contestant's evidence, standing alone, would be sufficient to justify an issue devisavit vel non, it will not be awarded if proponent's evidence is so strong as to make clear the fact that, in conscience, a chancellor could not sustain a verdict against the will.

2. Less capacity is needed to make a will than is usually required for the transaction of ordinary business.

3. No very great share of reason is necessary to validate a will where no fraud or imposition is shown.

4. A decedent possesses testamentary capacity if his mind and memory are sufficiently sound to enable him to know, and to understand, the business in which he is engaged at the time he executes his will.

5. Every person has testamentary capacity, if he has an intelligent knowledge regarding those who are the natural objects of his

bounty, of what his estate consists, and of what he desires done with it after his decease, even though his memory has been greatly impaired by age or disease.

6. The attestation of a signature to a will, or other document, is a direct assertion by the witness that the maker is competent to understand and execute it.

7. Expert testimony, whether given by physicians or others, is of no value when opposed to established facts.

*Appeals—Printing part of testimony—Quashing appeal—Act of May 11, 1911, P. L. 279—Rules of court—Rule 55.*

8. An appeal depending on issues of fact should be quashed, if appellant omits any part of the testimony produced at the trial, unless it is excluded by agreement, or by proceedings under Rule 55 of this court, or under the Act of May 11, 1911, P. L. 279.

9. Rule 55 is mandatory and the method provided in it must be followed.

Argued October 16, 1923. Appeal, No. 121, Oct. T., 1923, by Mary Snyder Drew, decedent's daughter, from decree of O. C. Allegheny Co., June T., 1921, No. 415, dismissing exceptions to findings of fact and conclusions of law on appeal from register of wills admitting to probate papers purporting to be will and codicil in estate of William Penn Snyder. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ. Affirmed.

Exceptions to findings of fact and conclusions of law of TRIMBLE, J., on appeal from register of wills.

Exceptions dismissed by WORK, P. J., specially presiding, MILLER, P. J., and TRIMBLE, J. Mary Snyder Drew, decedent's daughter, appealed.

*Error assigned* was, inter alia, decree, quoting record.

*John C. Bane* and *David A. Reed,* of *Reed, Smith, Shaw & McClay,* with them *Edwin W. Smith,* for appellant.—The test of the substantiality of a "dispute," within the meaning of the statute, is whether a verdict of a jury, on the evidence submitted, finding the alleged

will to be invalid, could be supported or sustained by a trial judge on a review of all of this evidence: Sharpless's Est., 134 Pa. 250, 259-60; Tetlow's Est., 269 Pa. 486; Phillips's Est., 244 Pa. 35.

*Geo. C. Wilson,* of *Wilson & Evans,* and *Geo. E. Alter,* with them *Alexander C. Tener,* for appellees, cited: Stevenson v. Stevenson, 33 Pa. 469; Cauffman v. Long, 82 Pa. 72; Wilson v. Mitchell, 101 Pa. 495; Mulholland's Est., 217 Pa. 65; Draper's Est., 215 Pa. 314; Masseth's Est., 213 Pa. 136; Shreiner v. Shreiner, 178 Pa. 56; Kane's Est., 206 Pa. 204; Macauley's Est., 224 Pa. 1; Klein's Est., 207 Pa. 191; Morgan's Est., 219 Pa. 355.

OPINION BY MR. JUSTICE SIMPSON, January 7, 1924:

This is a second appeal in a will contest; on the first one we simply affirmed the court below for ordering a rehearing: Snyder's Est., 274 Pa. 574. Much testimony was then produced by appellant, who is decedent's only daughter, and by proponents. In a masterly opinion, the trial judge reviewed it fully, and advised a dismissal of the petition for an issue devisavit vel non: (1st) Because appellant was estopped from making the contest, since she had received from decedent much money and property (which she still retains, and has not offered to return) during the very period in which she now alleges he was wholly incompetent and without lucid intervals; and (2d) Because, in any event, a verdict against the will could not be sustained, since the evidence overwhelmingly establishes the fact that decedent was fully competent. The court in banc adopted the findings of fact and conclusions of law of the trial judge, and decreed a dismissal of the petition; from this the daughter now brings her present appeal.

We do not deem it necessary to review the decision on the question of estoppel, as we are all clearly of opinion there is no room for doubt as to testator's competency. In considering this latter point, we shall

quote, so far as may be, the basic facts, as found by the trial judge, instead of restating them in our own language, since the exceptions and argument challenge only the ultimate conclusions of fact, which cover the entire case; the contest, as now made, being over the alleged failure to give full effect, at this stage of the case, to the reported findings. We have read, however, the entire 1,438 pages of evidence, some of it several times, and see no reason to change any of the court's conclusions regarding the second ground for its decision.

At the outset we are again faced with the perennial contention that because the imperative "shall," appears in section 21 (b) of the Act of June 7, 1917, P. L. 363, 382, an issue must be awarded, if there is any evidence upon which a jury, sitting as at common law, could find a verdict against the will. A jury is not, however, the only arbiter of the facts in this class of cases, and for nearly a century we have consistently so held. It suffices to refer to Phillips' Est., 244 Pa. 35; Tetlow's Est., 269 Pa. 486, and Doster's Est., 271 Pa. 68. While there is ample authority for the proposition that, if contestant's evidence makes out a case for the jury, an issue should be awarded, unless proponent's is so strong as to render it clear that, in conscience, a verdict against the will could not be sustained; yet it is the chancellor's conscience, and not a jury's which is to be satisfied in the first instance. When his enlightened conscience stands in the way of an issue, it should never be awarded.

In the instant case it is not claimed that testator was unduly influenced in making his will, or was imposed upon by any one; it is only alleged that he lacked testamentary capacity. This materially limits the scope of the inquiry, for "no very great share of reason is necessary to validate a will, where there is no fraud or imposition": Heister v. Lynch, 1 Yeates 108, 114. Furthermore, there is here no attack upon the integrity or capacity of the two lawyers who drew the will and codicil, nor on the honesty of the survivor, when he says

testator was not only competent when he executed those papers, but also fully understood what he was doing at the numerous consultations during their preparation. The will is long, and to some extent involved; it names certain friends, relatives, charities and faithful employees whom testator wished to and did reward by legacies; it sets forth of what his estate consisted; refers to his business, and how in detail he wished it conducted after his death; and how the trustees were to manage his estate until the termination of the trust, which was to continue during "the life of my said son and daughter, and not exceeding twenty years thereafter," unless the "executors shall find [it] practicable to make an earlier distribution."

Assuming the truth of the unchallenged testimony of the subscribing witnesses, it would be difficult, if not impossible, to find another testamentary disposition, which, within itself, tends more clearly to show that the testator must have had "a full and intelligent knowledge of the act he is engaged in, a full knowledge of the property he possesses, an intelligent perception and understanding of the disposition he desires to make of it, and of the persons and objects he desires shall be the recipients of his bounty,"—the test fixed by the law for determining the validity of a will, even when attacked on the ground of undue influence as well as that of lack of testamentary capacity: Wilson v. Mitchell, 101 Pa. 495, 502. Apparently, appellant's only objection to the present will grows out of the fact that her equal share of the estate is left in trust, while those of her mother and brother are given absolutely. This, however, is a very common provision for a daughter; and is, moreover, exactly the course which testator had pursued, when he made distributions during his lifetime, because it was the method he had determined to follow ever since she was a little girl; and to this manner of disposition he always adhered, despite the repeated solicitations of herself and her counsel.

The court below sets forth briefly but sufficiently, decedent's life history, prior to the date when appellant claims he became wholly incompetent, as follows:

"William Penn Snyder was born September 25, 1861, and died February 3, 1921......During the greater part of his life he lived in the City of Pittsburgh, and, in the latter part, in that city, and in Palm Beach, Florida, in the winter, and in a country home on Sewickley Heights, Allegheny County, in the summer. The first view we have of him is as bookkeeper in 1878, for a concern engaged in the iron and steel business; and from this time to the end of his life he never followed any business except the mining and transportation of ore, its conversion into pig metal by the operation of blast furnaces, and mining of coal, the manufacture of coke, and the sale of these products. He was the owner of the business known as W. P. Snyder & Company, but the bulk of his operations were through the Shenango Furnace Company, and the Shenango Steamship Company, corporations organized by him, in which he owned ninety per cent of the stock, and which were developed to a high standard of efficiency......

"He was devoted to his business and family; he spent much time at his home and in travel. He was not inclined to talk much, and was known and regarded as a man to listen to others, rather than to engage in conversation himself. He was generous, in his lifetime, in the distribution of the fruits of his labor to his wife, his son and his daughter. His homes were always open to the members of his family for all manner of social gatherings for their enjoyment......He was interested in charities, being a director of the Allegheny General Hospital, and in education, being at the time of his death a trustee of the University of Pittsburgh. He read much prior to 1918, and when the opportunity afforded traveled far and wide, going to Europe, South America, the West Indies, the Rocky Mountains, California, New York, and Palm Beach, Florida; he also spent much of

his time in the summer on ore boats owned by his company on the Great Lakes.

"Prior to 1916, he was fond of sports of all kinds, entered into them willingly and with much vigor, and encouraged his children to do likewise.

"Mr. Snyder became a very wealthy man through the production and distribution of steel, iron and coal products, and his attention to his business; after his death the appraised value of his personal property was $9,-372,967.65."

Appellant alleges decedent's total incompetency began in November, 1916, when he had his first apoplectic stroke. The doctor, upon whose testimony she greatly relies, fixed testator's total incapacity at the time of his second stroke, about two years later. This, it is averred, was followed by hardening of the arteries, which inevitably results in progressive unsoundness of mind, culminating in senile dementia. We quote again from the opinion below, as giving an accurate résumé of appellant's evidence on this branch of the case:

"In enlarging upon his physical infirmities the witnesses testify that these were manifested by his failure to talk at times around his house, to members of his family, employees and visitors; his speech was very thick and husky, incoherent, was of the slurring type, and his voice was odd;......his tongue was very thick, he could not get out the words he wanted to say; he would start a sentence and get half way into it and just stop; he was very hard to understand unless you were used to him; he stuttered, muttered and lisped. His locomotion was impeded; he walked kind of shuffling. He leaned to the right and backward; his right foot would drag; he......never could clear the floor very good with his heel, kind of dragged; his balance was very poor; his back was affected;......his right side seemed to be paralyzed, and he could not use his right arm or leg properly. Once he fell backward on a gravel path when stepping backward, no impediment being in

the way; his walk was staggering like and was unsteady
and jerky, and he would stumble where there would
not seem to be anything on the floor or ground,......He
didn't show much energy, was listless in his movements,
and at times moved from place to place by steadying
himself on objects along his path. He would put his
hands on the arms of a chair and try to raise himself;
sometimes he would get half-way up, then fall back in
the chair again; when he would get to his feet he would
stop a few seconds, get his equilibrium, then start off;
when walking he would lean away back out of plumb.
......After a walk or when coming home from his
office he would be very exhausted, very tired out, and
would pant very hard for breath......His appearance
indicated sickness; his face was flushed, he had a mot-
tled complexion, showing bluish, red and white spots.
His countenance was blank, and he had very little
expression in it;......his face was turned to one side;
his nose was operated on; he had his eyes examined and
his teeth pulled, used false teeth, and was nervous.
Several times the discharges from the waste reservoirs
of his body were involuntary and uncontrollable. He
was a very sick man, emaciated; he looked rather hag-
gard. There was always saliva oozing from his lips.
Once he had a dizzy spell and fell in the bath, and had
to be assisted to his bed. He had dizzy spells quite
often. He had cardiac asthma in the early part of 1919,
and had a great many and very severe attacks there-
after. He had the influenza in January or Febru-
ary, 1919. From 1916 to his death his illness was getting
worse all the time.

"With regard to his mental condition, they say: The
testator was much distressed in mind; he was like a man
who wanders around sort of looking for something,.....
as though he didn't exactly know what he wanted; he
would go a short distance, turn back, and probably re-
peat; he had trouble with his voice and would not talk;
it was necessary to talk at him, not to him, but he was

glad to have persons talk to him if no burden was put upon him; ......he was saved by his family the embarrassment of having to attempt to reply to remarks to him. He was emotional; he was very tearful, laughed and sobbed much. Having been a great reader, he quit; he didn't read at all after 1918; he said he could not read; he could not grasp the meaning of it.......His daughter would read to her father, and after she had finished he would not know the story. He could not get his mind on reports which he received from his office, was not able to get what it was all about. His mental condition produced a bad temperament, for he was very irritable, and he got very mad once at a dinner party; having forgotten it, he claimed he had no notice of it. His memory was very bad; he repeated questions within a few minutes; he didn't remember the names of his friends, and he could not recognize people, but this did not relate to the members of his family. He didn't remember the instructions of his physician, he didn't follow them out any ways. Memory books were procured for him, and a trial of these made him tired and nervous. He could not remember the names of any of the presidents except President Wilson; he didn't have any memory; he had some memory, but it was......not so much. He didn't understand trust papers prepared for the benefit of his daughter, he said her interest was the same as her brother's; the little things you would say to him, little things, he certainly could understand. He telegraphed to petitioner's physician, when she was in full health, to find out if she could remain in Florida two weeks. The petitioner thought this 'very strange' and remarked, 'Why should he ask the doctor whether I could stay down in Florida.' This occurred in February, 1920. He didn't understand plots in movie picture plays, and once he failed to get the proper change when he was paying for tickets for himself and his son-in-law."

It will be observed that this evidence, though showing partly mental and partly physical impairment, actually

relates almost entirely, if not wholly, to the physical results on the brain and body, caused by the apoplectic stroke. This disease, like any serious blow affecting the brain, at first, either in whole or in part, impairs loco-motion, bewilders the mind, and begets a desire to be alone, in order that the patient may adjust himself to his unusual condition. After a time, some or all of these effects wholly or partially wear off; and those things which were nearest and dearest to him are usually the first to be again considered. This is exactly what oc-curred with decedent. When the paralyzing effect of the stroke became less, he regained his interest in his family, his property and his business, and became fully competent, even though the other effects remained, and other matters, in which he had been previously inter-ested, but to a less degree, were neglected. A failure to consider the matter chronologically, and to ascertain testator's condition after the first effects of the stroke had passed, explain many, if not all, of the supposedly derogatory matters testified to by the lay witnesses called by contestant, and renders their opinions valueless, as it does also the opinion evidence of the physicians, now to be considered. In order to definitely fix the dates of attendance of such of them as personally saw decedent we quote from appellant's history of the case, as follows:

"As early as June 3, 1917, Dr. Charles W. Burr, the eminent alienist of Philadelphia, [who never saw tes-tator except on this occasion] ...... came to decedent's summer home on Sewickley Heights [for that purpose]. ...... During three years, between December, 1917, and December, 1920, Dr. Jacob Wolf [at one time decedent's family physician], ...... when decedent was residing in his winter home on Ridge Avenue [Pittsburgh], visited him almost daily, and when he was very ill, twice a day; when decedent was residing in his summer home on Sewickley Heights, Dr. Wolf visited him every three or four days, when he was seriously ill, every day, and on some occasions, remained with him over night. In

March, 1918, in February and March, 1919, and January, February and March, 1920, during decedent's winter sojourns at Palm Beach, Florida, he was attended by Dr. Hobart Endicott Warren......On May 5, 1918, Dr. Warren......came to Sewickley Heights, for the purpose of examining decedent, and consulting with Dr. Wolf concerning the medical treatment of decedent."

The testimony of these doctors, and of two others who appeared as experts only, covered nearly one hundred pages of printed matter, and while detailing at great length what decedent's physical condition was, and asserting he had "a very slow action of the brain," "more or less a lack of memory," that he "had now developed a loss of memory of words, which is known as amnesia," etc., etc., they admit they knew nothing of his business, or how he transacted it. The only fact stated by any of them as showing weakness of mind, refers to the memory tests regarding the presidents, etc., above referred to, but these have little or no relevancy on the question of testamentary capacity. A testator's "memory may be very imperfect; it may be greatly impaired by age or disease. He may not be able at all times to recollect the names, the persons or the families of those with whom he had been intimately acquainted; may at times ask idle questions, and repeat those which had before been asked and answered; and yet his understanding may be sufficiently sound for many of the ordinary transactions of life......The question is not so much what was the degree of memory possessed by the testator, as this—Had he a disposing memory? Was he capable of recollecting the property he was about to bequeath; the manner of distributing it, and the objects of his bounty? To sum up the whole in the most simple and intelligent form—Were his mind and memory sufficiently sound to enable him to know, and to understand, the business in which he was engaged at the time he executed the will": Wilson v. Mitchell, 101 Pa. 495, 502-3.

Yet these physicians, despite their ignorance regarding decedent's actual transaction of business, and of the legal test as to capacity in this class of cases, especially where fraud and imposition are not alleged, one and all assert he was not competent to transact business, nor to make the will or codicil, in controversy. Apparently, also, each of them mistakenly supposed the test of capacity was the same in both instances, despite our repeated rulings that "less capacity [is needed] to make a valid will than is sufficient in most cases to transact ordinary business": Thompson v. Kyner, 65 Pa. 368, 382; Guarantee Trust & Safe Deposit Co. v. Waller, 240 Pa. 575.

Each of them further said that, in his opinion, when testator made his will, he could not have had "an intelligent comprehension of the nature, value and character of his estate; [nor] an intelligent comprehension of the persons who were the natural objects of his bounty; [nor was he] mentally capable of comprehending the nature, effect and consequence of the making of a will; [nor was he] mentally capable of devising a scheme of distribution of his estate, and the method of carrying that distribution into effect." Yet neither in their testimony, nor elsewhere in this record, unless valueless opinions are to be treated as evidence, is there anything showing he was ignorant respecting any of these matters; and every witness, except one, agreed that he knew the persons who were the natural objects of his bounty, her naïve statement being that, although he knew and loved all the members of his family, he did not know them, because "he didn't appreciate them," which she later interpreted to mean "I believe he didn't realize his responsibility and obligations to them."

Moreover, the former family doctor, who was one of these witnesses,—and upon whose testimony, with one exception, all the other opinions are largely based,— admits that, some six months before the present will was executed, he witnessed another one for testator, although the doctor now says he then knew decedent

was not competent to make it. He said he did not know
it was a will; an excuse which avails nothing, however,
since, if decedent was not competent to make a will, he
was not competent to make any contract; and the wit-
ness must have known that his attestation, especially as
he was then the family physician, was a direct assertion
of testator's competency.

Surely very little weight should be given to such
opinions; for it must be clear, as Dr. Burr (whose opin-
ion was based entirely on the statements of the others)
admitted, that if testator "decided questions of great
import, if he was able to discuss with big business men
of this time questions of finance and steel and coal and
coke," as decedent did until long subsequent to the mak-
ing of his will and codicil, "then the man was certainly
not a demented man, and all the doctors are wrong," for
"a demented man cannot carry on a big business. As a
matter of fact, he cannot carry on even a little business
day after day, day in and day out. His memory is too
poor." Upon this point, therefore, we need only again
state, what we have often said, that, under such circum-
stances, the opinions of physicians, like those of other ex-
perts, are valueless, because being "opposed to
established facts [they] are not entitled to much respect
(Draper's Est., 215 Pa. 314; Klein's Est., 207 Pa. 191);
especially as this character of testimony "is weak of its
kind, and its kind is the very lowest that is ever allowed
in a court of justice...... [besides which] the entire
failure to show a single unbusinesslike act on his [tes-
tator's] part, would so far neutralize the theoretical
opinions of the physicians as to his mental capacity
...... [as to render them] insufficient to go to the
jury": Central Guarantee Trust & Safe Deposit Co. v.
White, 206 Pa. 611, 615.

Our careful reading of all of contestant's testimony,
leaves us in grave doubt as to whether or not,—in view
of the undisputed facts regarding the making of the will,
—it would, if standing alone, have justified the award-

ing of an issue; but assuming it would have, that evidence did not stand alone.   On the contrary "the court is convinced that the proofs on [proponent's] side are so strong that they overcome the opposing prima facie case [if we assume this existed] and leave no substantial dispute": Tetlow's Est., 269 Pa. 486, 495; hence the issue was properly refused.   To show this, we again quote from the opinion below:

"The proponents met the testimony of the petitioner and her witnesses, by evidence which clearly established that throughout the years 1918, 1919 and 1920, decedent had sufficient physical vigor to enable him to travel over the country from Palm Beach, Florida, to his ore mines, eighty-five miles northwest of Duluth, Minnesota. ......During the summer of 1919 he made three trips, and in 1920 two, from Pittsburgh to his ore mines in Minnesota.   While there he descended by a spiral railroad on an open freight car into his open mines,....... for the purpose of inspecting them, and met and talked to some of the men known to him, who were in the employ of his company......While on the ship he went to the engine room, one flight of stairs below the main deck in the rear; returning to the deck he would walk along the full length of the ship, over six hundred feet, and ascend three flights of steps to the pilot house, and descend daily at will, unattended and alone, with no person to aid or assist him in any way whatever, except a valet who traveled with him from 1915 to 1920, inclusive, performing such services for him as one in this calling would be expected to do.   In all of these travels in 1919 he had sufficient strength and agility to disembark from his ore boat, either by ladder or gangplank, to a tug boat and from it to the dock, thence by way of taxicab and train to the mines, and return to the boat in the same manner, without assistance.   It is admitted by every person that he went to his office in the city, between ten and eleven o'clock a. m. daily, except when away on a business or pleasure trip, and at rare times

when he was unable to do so by reason of sickness,......
[returning] between two and five o'clock p. m.; and
this habit continued, until some time in January, 1921,
close to the time of his death, and more than thirteen
months after the execution of the will and codicil......

"After 1918 we do not find him actively participating
in outdoor recreation, such as horseback riding, swim-
ming and playing squash, which had claimed his atten-
tion prior thereto.   He was changed; his health was
impaired and he was losing his former vigor; he was con-
sulting physicians, and there was some family talk that
he had suffered a slight stroke......As late as August,
1919, his photograph, taken on one of his ore boats rest-
ing in the locks at Sault Sainte Marie, doubtless shows
his actual appearance at that time.   There, in the com-
pany of his friend, who was with him on one of his trips
up the Great Lakes, he appears to be strong physically;
he is standing alone with his right hand on the rail of
the texas deck, and there is nothing to indicate that he
had been afflicted in any such manner as the witnesses
for contestant would have us believe.

"Mr. Snyder began to relieve himself of some of his
responsibilities in 1917, when he retired from the direc-
torate of two trust companies in the City of Pitts-
burgh, his son replacing him, at his request; and in June,
1918, as president of the corporations which he had cre-
ated many years before, and brought to a commanding
position in the commercial world in competition with
other great concerns,......and was followed by his son,
then a vice-president.   But he did not retire from active
business; he was elected chairman of the board of direc-
tors of the Shenango Furnace Company, and continued
in this position and performed his duties as such, eight-
een months before and fourteen months after he made
his will.   This was a period when all of the human and
artificial agencies for the production of ore and finished
materials were over-tasked with the demands of war.
The Shenango Furnace Company at that time was pro-

ducing fifty per cent of all the steel used in the manufacture of ingot moulds in the United States, a product indispensable for the manufacture of ammunition for high-power guns, and great quantities of pig iron; its boats and those of the Shenango Steamship Company, an affiliated corporation, five in all, of great size, two of which having a capacity of more than thirteen thousand tons, carried coal to the upper lake ports and iron ore and grain on return trips to ports on Lake Erie......
At this time Mr. Snyder was fifty-seven years of age, and beyond doubt in failing physical health, and the duties of president of the Shenango Furnace Company required his presence in many places; the son was more able to attend to these duties outside of the City of Pittsburgh than his father, and it was for these reasons the father resigned and placed his son in this position.

"Beginning with the year 1918 and closing with the 31st of December, 1920, the Shenango Furnace Company held regular meetings of the board of directors, and Mr. Snyder participated as chairman in twenty of these meetings, held prior to the execution of his will, and eleven held at various times thereafter. Many transactions of vital importance to his company were discussed at these meetings and action finally taken by the board in his presence, but when any matter of great concern to the company was involved, the other directors and officers, who were present, say that his word was always final. Matters involving millions of dollars were passed upon, and in no case, traceable to the decedent, was there any loss to the company......Between regular meetings of the board he was at the office a great part of the time, and bought liberty bonds in large amounts for the company; his final word was given to a refusal to build coke ovens because of excessive cost, and his judgment was correct, [as it was] also in refusal to enter into a proposed consolidation with a large and prosperous manufacturing concern, which could use the products of his furnaces. An advantageous contract in-

volving $1,090,000, for the purchase . of coke for the
year 1919, was made and signed by the decedent, with
the officers of a coke company, who preferred to wait
and consult with Mr. Snyder after his return from a
trip to Minnesota in 1918, rather than to deal with the
other officers of his company.   Throughout all of this
time, until about the middle of January, 1921, he was
consulted constantly by the other officers of the company
in all important matters of business......

"He had attorneys-in-fact to sign his checks for him;
but, notwithstanding this, from the beginning of 1918
until his death, he signed or approved ninety-six checks
in payment of various accounts, such as taxes, contri-
butions for political purposes, gifts to charities, and to
his wife, son, daughter and sisters; fifty-nine of these
checks were signed by him prior to the date of the will
and five after; and, in addition to this, he approved
nineteen accounts prior to the date of the will and
twelve after.   Within this period he was accustomed to
go about the city and transact some of his business
alone; he went to the bank, to his haberdasher, to his
dentist as late as January, 1921, to the Duquesne Club
for cigars, and to his physician.   On May 3, 1920, he
loaned $500,000 of liberty bonds at one time, on a writ-
ten contract which was profitable to him, and twice he
borrowed $325,000 on a collateral note, the first on June
11, 1919, and the second on September 9, 1919, less than
three months before he made his will.

"The most striking evidence, and wholly uncontra-
dicted except by opinions, was the revelation of forty-
four typewritten letters, which decedent dictated to his
stenographer, and which were signed by him, during the
period beginning about the first of 1918 and ending
shortly before his death.   These show that he was attend-
ing to his business, and some social and charitable
duties; in some of them he acknowledges that he is not
well and cannot join in social matters, but delegates his
son to take his place; each letter expressed a compre-

hensive and intelligent grasp of the thing at hand, no matter what the subject was. In a series of letters to his mine superintendent at Duluth he displays beyond doubt that he knew his mines, and those of other concerns, and the kinds of ore produced, and was familiar with the development of mines, other than his own, by reason of knowledge that he had obtained elsewhere than that which his superintendent gave him; he expressed concern for people who might be in distress from a forest fire near his ore mines, aided generally by his contributions all of the people who suffered from this fire, and described its atmospheric effect at his home in Sewickley. One [letter] tells of a discussion he had about the water supply in Lake Superior, his investigation afterwards and the result; others show his tendency to give expression to his religious training of early days, for he contributed handsomely to a church which he had erected, with his own funds, in memory of his father, and expressed his gladness for being able to do so. His letters to his sister show that he remembers affectionately and graciously his family ties, and the one to his son his affection for him. Altogether, aside from business, they show that he had many of the feelings which are common to normal persons; not a trace of insanity can be found in any one; all are well written, in a clear and concise style, and the extent of his command of language is creditable to any man who was compelled to go to work at a very early period of his life......

"His views on ore productions and consumption, and the outlook for increased shipping facilities for transportation on the Great Lakes, were sought by prominent men interested in these affairs, and with some of these he conversed before and after he made his will. Men from Duluth, Detroit, Chicago, Cleveland, and many from Pittsburgh and this vicinity, were called as witnesses. They saw him and talked with him, some about business, others exchanged reminiscences, and others had social meetings in his office, on the street and in

travel. One and all of them state positively that the decedent was competent to make his will, to transact business, to engage in conversation with them, and that he was not affected physically to the extent contestant and her witnesses describe, and not one of them noticed any impairment in his mind. His mental condition on December 31, 1920, the last and a very important meeting of the Shenango Furnace Company which he attended in its offices, was sufficient to enable him to understand all the business that was transacted.

"He had other business transactions disconnected with his corporation [in addition to those in which contestant was interested, as above set forth], some of which are as follows: On the 9th of September, 1919, decedent purchased a house and lot in Sewickley for his valet, the property which was devised by the will to him. Some time after this purchase decedent gave to his valet a receipt written in his own handwriting for two hundred dollars, which was a part of the purchase price; this is the only writing in decedent's hand, and contains a slight repetition of words. On the 24th of September, 1919, Mr. Snyder and his wife entered into a contract, to convey to one of the officers of his company, a lot of ground situate in the Borough of Avalon. On the 28th day of November, 1919, the day on which he executed. his will, he signed a paper which is a gift to his wife of two hundred and forty-seven bonds of the American Telegraph & Telephone Company, of the value of $247,-000. This is one of the papers which he declared on that evening he had signed after consultation with his wife. On the 22d of January, 1920, he entered into a contract to purchase for his son a house and lot on Morewood Avenue, in the City of Pittsburgh, for $140,-000, which money he afterwards paid, his son taking title to the premises. On the 15th of April, 1920, Mr. Snyder and his wife made a gift to his valet of the home purchased for him, which was made complete by the execution and delivery of a deed of the premises. He

declined to become interested in a shipbuilding company on the Great Lakes, and, for the reasons which he gave, the company was never organized. He attempted to negotiate for the purchase of coal lands; he made an application for three million dollars of insurance bonds with a responsible life insurance company, and when he discovered the contract was not what he expected it to be, and that there was a question whether he would be liable for federal tax on the amount, contrary to the representations made to him when he made the application that he would not be, he refused to entertain the offer of the company [this refusal being a wise one, as appellant's witness admits]; after investigation of a boom in gas territory in McKeesport, near which place he owned land, he refused to lease it for the price that was offered, saying that he could obtain more for the coal underlying it, and afterwards sold this property at a price which confirmed his judgment. On May 5, 1920, he exchanged eight thousand shares of the Shenango Furnace Company stock for two million dollars of liberty bonds, which he had previously given to his wife, and gave five thousand shares of the furnace company stock to his son, in order to reduce his federal tax, after consultation with Messrs. Dyer and Demms, his associates, and his counsel, Mr. Evans, who advised him how to make the exchange, and was present when the verbal agreement was made between him and his wife."

A consideration of proponent's evidence, as thus epitomized, demonstrates, beyond all question, that contestant's testimony has been met and overthrown, even if, standing alone, it would have justified an issue; for no court could, in conscience, have sustained a verdict against the will and codicil, in the face of the overwhelming and undisputed proofs of the many and important business activities successfully carried on by decedent, before about the time of and after the execution of those documents. If all the differences of recollection between the witnesses for the two parties, relating as

they do to comparatively unimportant matters, were resolved in favor of contestant, indeed, if we were to eliminate all the testimony of proponent's witnesses, who were thus contradicted in part, the overpowering evidence of competency would remain unshaken; so much so, the writer may add, that in all his experience, he has never known any other case in which the evidence of a testator's business capacity was so fully, overwhelmingly and undisputedly established, as it has been in this one.

If we had not decided to affirm, we would be compelled to quash the appeal. The petition filed for this purpose sets forth thirty-five particulars, in which it is averred appellant has "assumed to decide for herself, the meaning, force and materiality of certain portions of the evidence, and, contrary to the rules of the court and the statute [Act of May 11, 1911, P. L. 279], has, in printing the record, misdescribed, abridged, garbled and misstated the same." The answer of appellant denies most of these averments, and particularly the final one, but it admits she made no attempt to comply with Rule 55, so far as relates to certain of the exhibits offered at the trial, stating they "were not printed in full in this record [because they] contained much matter which is not necessary for a proper consideration of this cause; the printing of all of their contents would have been burdensome and very expensive; and, if they had been printed in full, much time would have been required to cull from them such facts as may be supposed to be material here."

These averments of the answer may be, and probably are, true; but it must be clear, beyond all controversy, that contestant had no right to decide for herself how much "is not necessary for a proper consideration of this cause," much less to fail to print the whole of any exhibit, because, in her opinion, only some part of it is material. If this right were accorded to an appellant, he could, in this class of cases, for instance, omit all

countervailing evidence, because in his opinion, the "shall" in the Wills Act, necessarily determines that only such evidence as tends to make out a prima facie case in his favor, is "necessary for a proper consideration of this cause." Justice could not be judicially administered if a litigant was permitted to decide this or any other disputed question. Rule 55 was adopted for the purpose of enabling the record to be abbreviated on appeal, so far as properly might be done; but it gives to no one the right to determine for himself what shall and what shall not be printed. The parties may agree upon this; but, if they cannot, the court must decide, as in all other disputed matters. We ought not to be required to say that Rule 55 is mandatory and must always be obeyed; but since counsel appear to think this is not so, we now emphatically state that it is.

The decree of the court below is affirmed, and the appeal is dismissed at the cost of appellant.