# Staunton

WESTERN STATE HOSPITAL OF STAUNTON, VIRGINIA V. GEORGE F. WININGER, ET AL., HEIRS AT LAW OF F. S. GLASSETT, AND CHRIST EPISCOPAL CHURCH OF BLACKSBURG, VIRGINIA.

September 8, 1954.

Record No. 4243.

Present, Hudgins, C.J., and Miller, Smith and Whittle, JJ.

The opinion states the case.

*Rudolph Bumgardner, Jr.* and *Bentley Hite,* for the appellant.

*Dalton, Poff & Turk* and *R. L. Humbert,* for the appellees.

MILLER, J., delivered the opinion of the court.

On January 27, 1950, Frederick S. Glassett, a childless widower, died in Western State Hospital, Staunton, Virginia. He was adjudged insane on November 7, 1931, and had been an inmate of that institution since that date.

Glassett left real and personal property amounting to nearly $20,000, and this litigation was instituted to determine which, if either, of two holographic paper writings constituted his will. One of the instruments was executed before the adjudication of insanity, and the other had been written while he was an inmate of the hospital.

Glassett's wife had died during February, 1931, and both writings were dated subsequent to her death.

Both instruments are signed "F. S. Glassett," which was the usual way he signed his name, and the writing bearing the earlier date, called the first will, is admittedly testamentary in character. It is in form a holographic will, dated March 21, 1931, with a codicil dated March 25, 1931.

By this first will testator devised an interest in a parcel of real estate which he had acquired from his wife at her death, to her brother and sisters, and left all the residue of his estate to his sister, Mary S. Glassett, his closest relative. However, by the codicil of March 25, 1931, a lot of land in Montgomery county was devised to Christ Episcopal Church, Blacksburg, Virginia.

The other instrument involved in this litigation reads as follows:

"Feby. 3rd, 1942

Mr. Guy F. Ellett
Christiansburg, Va.
"Dear Mr. Ellett:
"I want the Western State Hospital to have all of my property except enough for my funeral in Cedar Grove Cemetery, Portsmouth, Va., and for my sister's (Mary S. Glassett), in the same lot.

Yours very truly,
F. S. Glassett"

This writing, made while testator was an inmate of the Western State Hospital, is called the hospital will.

Mary S. Glassett was also an inmate of Western State Hospital when she died on December 13, 1948. She was afflicted with dementia praecox and had been in that institution for about twenty-four years. As she died before Glassett and without issue, the devise and bequests to her in the wills lapsed.

On September 15, 1950, at the instance of Western State Hospital, the clerk of the circuit court of Montgomery county probated the holographic writing of February 3, 1942. On March 3, 1951, Harry E. Wininger and others, heirs at law of Glassett, and Christ Episcopal Church, devisee under the codicil of March 25, 1931, appealed to the circuit court from the clerk's order of probate. Section 64-74, Code of 1950. All interested parties were convened, and on motion of Glassett's heirs, the court ordered a trial by jury upon the issue "Whether any paper, or if there be more than one, which of the papers produced, be the will of the decedent, F. S. Glassett." Section 64-79, Code of 1950.

The jury found in favor of the hospital will, and Glassett's heirs and Christ Episcopal Church moved the court to set aside the verdict and establish the will of March 21, 1931, with codicil attached, as testator's will. This motion was based upon two grounds, i.e., (1) that the writing of

February 3, 1942, was not testamentary in character, and its author did not intend it to be his will, and (2) the hospital had failed to prove that Glassett was competent to execute a will on February 3, 1942.

The court granted the motion, set aside the verdict and established the paper writing of March 21, 1931, with codicil attached, as Glassett's last will. The motion was sustained upon the ground that Glassett lacked testamentary capacity on February 3, 1942. That ruling rendered it unnecessary to decide whether or not the writing of February 3, 1942, was testamentary in character and intended as a will.

The hospital appealed and contends that the evidence was sufficient to prove that Glassett possessed mental capacity to make and execute the will of February 3, 1942. Glassett's heirs and Christ Episcopal Church insist that he was mentally incapacitated, and for that reason was unable to make a will on February 3, 1942, but that his capacity to execute the will of March 21, 1931, is sustained by the evidence.

If the proponents of the first will are successful in establishing that instrument, the heirs will receive all of Glassett's property not disposed of in that will. As the devise and bequest to Mary S. Glassett has lapsed, they will receive the bulk of the estate that Glassett left.

Assuming, but not deciding that the writing of February 3, 1942, is testamentary in character and was intended by Glassett to be his will, the sole question presented is whether or not the evidence, when viewed in the light most favorable to the hospital, is sufficient to sustain the jury's finding that Glassett possessed testamentary capacity when he executed that instrument. Its determination requires that the evidence bearing upon Glassett's mental condition be stated in some detail.

Glassett was born on October 16, 1877, and lived in Portsmouth, Virginia, until he entered Virginia Polytechnic Institute at Blacksburg, Virginia, as a student in 1916. He

received his B. S. degree in agronomy from that institution in 1921, and his M. S. degree in 1929. He did some part time teaching while a student, and upon graduation taught at V. P. I. as assistant agronomist and then as instructor in mathematics. The record shows that Glassett was cautious, hypochondriacal, and timid. He appears to have suffered to a degree from ringworm or athlete's foot, and by 1931 he had developed a belief that he was the victim of a serious skin disease, and about that time he became dejected and depressed. The date of his marriage is not shown, but shortly after the death of his wife in February, 1931, he made his first will. It was placed in a safety deposit box rented by Guy F. Ellett, Glassett's attorney who, on April 18, 1932, was appointed his committee. It remained in the deposit box until Glassett's death.

Glassett's mental disturbance became more serious and pronounced after his wife's death, and on May 19, 1931, he was admitted to Phipps Clinic of Johns Hopkins Hospital, Baltimore, Maryland, to be treated for his mental disorder. His condition may have been somewhat improved by the treatment received at Phipps Clinic. Yet as he was not well enough to be released after several months, arrangements were made by Dr. W. F. Henderson of Blacksburg, Virginia, Glassett's family physician, for his transfer to Western State Hospital, Staunton, Virginia. In a letter of November 4, 1931, to Dr. Rennie of Phipps Clinic, Dr. Henderson thus expressed himself on Glassett's condition:

"As I stated to you last Friday I have been Mr. Glassett's family physician for a number of years and was responsible for his coming to you. While his mental condition may have improved since he has been under your care, yet I am very fearful of what might take place should he be released on the public. I therefore agree with you in your stand of not being willing to take the responsibility of releasing Mr. Glassett, especially since he has no position to return to. I would suggest that he stay with you longer for treatment,

but since he is already worrying about his finances, he probably will improve more rapidly at a state institution where he will be at no expense. * * *"

When Glassett was transferred from Baltimore to Staunton on November 7, 1931, he was accompanied by an attendant. The memorandum made at Phipps Clinic on November 6, 1931, preparatory to his transfer, reads in part as follows:

"Mr. Glassett is in a mental depression and dangerous to himself. He is legally insane and for this trip is under the care of Mr. Dewey Fulcher who is representing this Clinic in the matter of the transfer.

Signed: Wendall Muncie,

Resident Psychiatrist"

A commission of lunacy was held at Staunton on November 7, 1931, before a justice of the peace and two physicians, and Glassett was adjudged insane and committed to Western State Hospital that day. The diagnosis was "manic-depressive psychosis—depressed type." That mental disturbance was described by Dr. James B. Pettis of Western State Hospital as "emotional disturbance that might exhibit behavior that would be pathological" in that the patient "may be depressed" or he may be "disturbed in his behavior" but "for the most part, they are constantly in touch with reality and know what is going on around them."

Subsequent to Glassett's admission and after his condition had been appraised, he was placed on what is called "an open ward." That allowed him to leave the ward after breakfast and enjoy the privilege of the grounds and have the right of going into town and returning in the evening.

Glassett was quite ill during February, 1935, with pernicious anemia, and during that time he suffered "depressive delusions and hallucinations." Between 1938 and early 1942, Glassett did some work in the library and helped at times in the offices at the hospital. However, his eyes were not strong, and the eye strain incident to this character of

work caused him to cease these activities for periods of time.

On February 7, 1942, Glassett delivered the writing of February 3, 1942, to Dr. De Jarnette, superintendent of the hospital, and Dr. Freed, a staff member, in the hospital office. On that occasion Dr. Freed dictated to Mr. Hemp of the hospital staff the following entry in Glassett's report:

"This morning he came up to Dr. De Jarnette's Office and appeared very depressed and had a very sad expression. He told the authorities here at the hospital that he had not done as much as he should have about the premises and felt like he was a shirker. He felt, too, like he should have tried to go out and make a living on the outside and as he had failed to do this and has been living on the State, he made his will, leaving everything he has to the Western State Hospital except enough to bury him and his sister.

"Dr. De Jarnette then asked him if he felt like killing himself and he said 'Yes, I have.' When asked how he would do it, he said he had the privilege of going to town and while over there he had gotten shells and a shotgun which he had in his room and he felt like shooting himself. In view of this, Dr. De Jarnette had him transferred immediately to Ward 21 and had the gun removed from his room at once."

Ward 21 is a locked ward and attendants are provided to minister to patients confined to that area of the hospital.

When Glassett delivered this writing, it was in an envelope bearing an uncancelled 3-cent stamp, and addressed to "Mr. Guy F. Ellett, Christiansburg, Va." It does not appear that the envelope was sealed when delivered, and at that time or thereafter someone other than Glassett, penciled the word "will" upon the envelope. The envelope and contents were placed in Glassett's file where they remained until his death. Also found in his file was the following unsigned statement wholly in his handwriting, which, though undated, appears from its contents to have been written about the same time as the hospital will:

"When I came here I was worrying about my eyes. They got inflamed and hurt after using them very much and I could not do my teaching work satisfactorily. I had had breaking out of skin (itching) on feet and Dr. Manley of Roanoke would tell of bad cases, bed cases, he had treated all making me nervous worse.

"I would in night hope day would not come as I was comfortable at night. I went to Johns Hopkins and stayed several months and left everything at home and felt like getting rid of life but could not make up my mind to.

"When I got in this hospital, I was sent by Hopkins here, I was at ease, but nervous whenever I thought about leaving it. I haven't worked around here like I should, the doctors have been nice and indulged me. After I had anemia, Dr. Freed said 'go to library and sit on a chair,' and told Bright on 17 that I was not to work.

"I've done a little work around here, however, I could have done more if it had been arranged for me.

"I consulted Drs. Hedges, Emory Hill, Stone and Williams of Roanoke about my eyes and did not get cured. Rest always brought them around, but I had to work.

"I probably should have gone away, but I felt I could not go out into the world and face work as only thing I knew that I could get a sufficient remuneration for required use of eyes. I was threatened with rupture and spent lot of money uselessly on doctors.

"Dr. Dudley Smith asked me what I did at W. S. H. and I replied nothing. I had pernicious anemia for five years. I did a few things in meantime. He refused to see me the last time I was at University Hospital.

"I believe I am being investigated and it looks as if I haven't treated the hospital right and I am afraid of the vengeance of people here. I am turning over all my property to the hospital and hope God has mercy on my soul.

"I now see that I should have gone to look for work to fit me, but it never forced itself on my consciousness till lately."

When Mary S. Glassett died in the hospital on December 13, 1948, Dr. Pettis informed Glassett, who was then depressed and housed on a closed ward, of his sister's death. He was touched by the news but seemed normal and intelligent and gave directions for locating the family burial plot and directed that contact be made with his committee to secure funds to defray the expenses of the funeral.

At the instance of the hospital, six members of its administrative and medical staff, *i.e.*, Mattie Bosserman, Fields Moss, O. C. Hemp, Martha V. Baylor, Dr. J. F. Fulton, and Dr. James B. Pettis, testified as to their observations of Glassett's conduct and expressed their opinions on his mental capacity. Dr. Pettis and Dr. Joseph R. Blalock, both experts in mental diseases, the latter of whom never saw Glassett, also testified in response to hypothetical questions based on facts adduced in the case and gave their opinions of Glassett's testamentary capacity.

The testimony of Mattie Bosserman, who was an accountant in the steward's office for thirteen years, was to the effect that she had contact with Glassett and observed his conduct from time to time between the years 1939 and 1946. These contacts and observations were made when he would come to the office about twice a week to make withdrawals from his spending account. She said that on these occasions "she could not detect anything that would infer that he was a mental patient" and that his conversations were orderly and clear. She did not remember seeing him after 1946, but at the times she observed him prior to 1946, she believed him to be "able to recall his family and the natural objects of his bounty."

Fields Moss, a stenographer, knew Glassett from 1940 until his death and saw him in the hospital or on the grounds "practically every day" and talked with him frequently. He said that Glassett was "perfectly rational" and "was an intelligent man and he was normal as far as I could tell." He also expressed the opinion that during the period that he observed and was in contact with Glassett

that he believed him capable of recalling his property, his relatives and natural objects of his bounty, and capable of understanding the business and activities he was engaged in.

O. C. Hemp, secretary of the hospital at the time of the trial and an employee in one or another of its offices for thirty years, said that he was in the office when Glassett brought the paper writing to Dr. De Jarnette and that he saw Glassett almost every day. He was asked the following question on his examination in chief bearing upon whether he had seen Glassett on February 3, 1942, or thereabouts, and gave the following answer:

"Q. And during the period of February on the just about,—say February 3rd in 1942, in that area, did you see him quite often?

"A. Yes, sir. I saw him frequently along during that time, before and after, of course."

He further said that Glassett "would be low-spirited and somewhat quiet and despondent at times," but that during the early part of 1942, his mental condition was "very good" and he understood what he was doing.

Martha V. Baylor, a registered nurse for thirty-six years and on the hospital staff since 1936, said she knew Glassett well from 1936 until about 1945. During that time she saw him almost daily and frequently talked with him. She expressed the opinion that he possessed the mental capacity to make a will during this entire period, including the periods when he was moody "because his thought content was not disturbed."

Dr. J. F. Fulton, assistant physician on male medical service from 1939 to 1948, lived at the hospital and while making rounds, he saw Glassett almost every day. He said that when he saw Glassett shortly after February 7, 1942, he found him depressed and at various other times "he would have periods of depression and then" feel better. In reply to questions from the court as to what was his independent diagnosis of Glassett and what he thought the patient was suffering from, he testified as follows:

"The Court: Doctor, what was your diagnosis of this man? He had been in your direct care for the periods which you have indicated. What do you say he was suffering from?

"The Witness: I say he was manic-depressive psychosis, depressed type.

"The Court: That is your independent diagnosis?

"The Witness: That is my own independent diagnosis.

"The Court: And you saw him every day or two?

"The Witness: Yes, sir.

"The Court: Do you say he was suffering from that along about February, 1942, or not?

"The Witness: Yes, sir. I think he was. As I say, I don't remember the exact date he was locked up. I don't remember that from my personal knowledge.

"The Court: Well, based on the file here?

"The Witness: Well, on the file, he was depressed at that time."

He, however, finally said that during the time that he observed Glassett, it was his opinion that the patient was in touch with reality and that he possessed sufficient mentality to remember his property, and the natural objects of his bounty, and comprehend how he might want to dispose of it.

Dr. James B. Pettis, was clinical director of Western State Hospital from March, 1939, until he entered the armed service in September, 1941. He was away from the institution until September, 1946, and since that time he has been superintendent of the hospital. Before he left for military service, he sometimes saw Glassett but did not know him intimately. He "had no personal knowledge of what his condition was at that time." After his return in 1946, he was more often in contact with Glassett and found him "a depressed patient at times but never a disturbed or violent patient." He diagnosed him "as a manic-depressive," but he also said that so far as he knew there was nothing in Glassett's record to indicate that he "was under a permanent

sense of delusion and hallucination." Nor when his sister died was he "so depressed that he did not know what things were going on." When asked would the fact that Glassett had purchased a gun and talked about committing suicide mean of itself that the patient was violent and insane, he said, "No, sir. I don't think so * * * "

Dr. Joseph R. Blalock, an expert in the diagnosis and treatment of mental cases, in answer to a hypothetical question based upon facts adduced in the case (part of which he had heard while in the court room), expressed the opinion that Glassett was mentally capable of making a will on February 3, 1942. Upon cross-examination as to whether Glassett would have been incompetent to make a will at times, he answered, "I would not hesitate to say he was capable at any time." But upon further interrogation as to testator's capacity to make a will at any and all times during his confinement in the hospital, his reply was, "My answer is that for most of the time he was able to."

The adjudication of insanity, which was had under Acts of 1910, ch. 102, p. 135 (§ 1017, Code of 1942, and, as amended, § 37-61, et seq., Code of 1950), was never vacated.[1] That adjudication must be regarded as *prima facie* evidence of his testamentary incapacity to make any will subsequent thereto. *Tate* v. *Chumbley*, 190 Va. 480, 57 S. E. (2d) 151.

There being no evidence to the contrary, the writing's date of February 3, 1942, must be accepted as the day on which it was executed.

Whether the evidence is sufficient to overcome the *prima facie* presumption of testamentary incapacity created by the adjudication of insanity and establish Glassett's testa-

---

[1] For power of courts of record, trial justices and special justices to adjudicate persons to be mentally ill, epileptic, legally incompetent, etc., see § 37-62, et seq., Code of 1950, Replacement Vol. 6 of 1953, Acts 1950, ch. 465, p. 902; § 37-61.2, Code of 1950, Replacement Vol. 6 of 1953, Acts 1952, ch. 700, p. 1142; and § 37-136, et seq., 1954 Supp., Code of 1950, Acts 1954, ch. 668, p. 857.

mentary capacity on that day is the vital, ultimate and controlling question.

"Mental capacity to execute a valid will may factually exist and be shown though the testator has been adjudged insane. *Lucas* v. *Parsons*, 27 Ga. 593; *In re Draper's Estate*, 215 Pa. 314, 64 A. 520; *Lewandowski* v. *Zuzak, supra*; *Keeley* v. *Moore, supra*; Page on Wills, Lifetime Ed., Vol. 1, secs. 148-153, pp. 301-309.

"A party may have been adjudged insane, yet to make a valid will the law only requires that at the time of composing and executing it, he be factually so far free of his affliction that the ordinary legal consequences of his insanity do not apply to what he is then doing. What his mental status is at the time he makes and executes the will is the controlling factor. *Forehand* v. *Sawyer*, 147 Va. 105, 136 S. E. 683; *Jenkins* v. *Trice*, 152 Va. 411, 147 S. E. 251." *Tate* v. *Chumbley, supra*, at 495.

"The question for decision is, was the alleged testator possessed of testamentary capacity at the time of the execution of the paper propounded as his will." *Tucker* v. *Sandidge*, 85 Va. 546, 551, 8 S. E. 650. 20 M. J., Wills, § 6, p. 139. *Prichard* v. *Prichard*, 135 W. Va. 767, 65 S. E. (2d) 65. Page on Wills, Lifetime Ed., § 111, p. 233.

If, upon the evidence, reasonable men might differ as to whether the author of the hospital will possessed testamentary capacity when it was composed and executed, then the verdict must be re-instated. Yet in determining that issue, the fact that Glassett had been adjudged insane and was *prima facie* incapable of making the will must be accorded its true significance. Clear and convincing proof that capacity existed at the time the will was executed is required to overcome the otherwise existing *prima facie* presumption of lack of capacity. That character of proof may not be supplied by indulgence in conjecture, surmise or speculation. Nothing short of clear proof of capacity when the instrument was drawn and executed will suffice. Because he may have been shown to have possessed the

necessary mental capacity at other times or on other days is not sufficient to overcome the presumption of incapacity on February 3, 1942, and establish capacity on that date.

In *Harden* v. *Hays*, 9 Pa. St. Rep. 151, the testamentary capacity of John Hays to make a will executed on September 24, 1844, was in question. An inquisition of lunacy that had been held in December, 1844, found "John Hays a lunatic, with lucid intervals and that he had been a lunatic for forty years before that time."

In commenting upon the necessity that clear and convincing evidence bearing upon the testator's capacity at the time of the execution of the will was required to sustain the will, the court said:

" * * * The very fact that no evidence is given bearing on the act of execution, is sufficient to expose its dangerous tendency and its certainty to mislead. It certainly imposes no hardship to require that, under such circumstances, evidence of the most unexceptionable kind and character, bearing on the very act of disposition, and confined to the time of execution, should be given. * * *

" 'For although it should be proved, that at a prior or subsequent day, he was incapable of making a will from the effect of temporary cause—such as fever and the like—it will not follow that he was so when the will was executed.' The converse of this proposition is equally true; for where a man is a lunatic, it does not follow he has a lucid interval from proof that he was sane before and after a certain period. * * * The only point of time, * * * to be looked to by a jury who are to decide on the competency of a testator to make a will, is *that* when the will was executed."

The hospital relies upon the case of *Tate* v. *Chumbley*, *supra*, in which the testator had been adjudged insane before her will was executed, nevertheless the will was sustained. But in that record ample proof is found to show what testator's mental condition was on the day her will was executed. Two weeks prior to its execution she had

been granted a furlough and was in her home when the will was drawn. It was attested by two competent witnesses, one of whom was living and testified as to the testator's mental capacity at the time the instrument was drawn and signed. Other witnesses who saw and talked with her on that particular day, one of whom was a physician, testified from their observation and contact with her on that day that she possessed testamentary capacity at the time her will was executed.

It is true that lay witnesses and experts of ability and long experience in mental diseases have expressed opinions that Glassett possessed mental capacity to make a will while confined to the hospital. Yet none of them has undertaken to say that he saw him on February 3, 1942, nor has any witness undertaken to say what his actual condition was on that particular day, based on observation or contact with him on that date. On the contrary, the evidence having to do with Glassett's actual condition on the day nearest in point of time to February 3, 1942, is the memorandum dictated by Dr. Freed on February 7, 1942, and that discloses definite mental disorder as of that time. Glassett's unsigned statement reciting that he was being investigated also seems to have been written about the time he drew the hospital will. These two items of uncontradicted evidence show that he was definitely suffering from his long-time affliction shortly after the will was drawn, and thus tend to strengthen and confirm the *prima facie* presumption of testator's incapacity on February 3, 1942, rather than overcome such presumption.

It must be remembered that the verdict was set aside by the trial court, and it is not entitled to the same weight on appeal as it would have been had it been approved. *Burch* v. *Grace St. Bldg. Corp.*, 168 Va. 329, 191 S. E. 672; *Fedele* v. *National Liberty Ins. Co.*, 184 Va. 528, 35 S. E. (2d) 766.

The experienced trial judge who saw and heard the wit-

nesses testify has concluded that the presumption of testamentary incapacity was not overcome. Since the evidence amply sustains that conclusion, the judgment of the court is affirmed.

*Affirmed.*